MOUNT MERCY ASSOCIATES, ALAN BERK, TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mount Mercy Assocs. v. Commissioner
Docket No. 11191-90.
United States Tax Court
T.C. Memo 1994-83; 1994 Tax Ct. Memo LEXIS 84; 67 T.C.M. (CCH) 2267; February 24, 1994, Filed *84 Decision will be entered for respondent. For petitioner: Leonard Rosen (specially recognized). For respondent: Randall P. Andreozzi. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, by means of a Notice of Final Partnership Administrative Adjustment (FPAA), determined adjustments to Mount Mercy Associates', a limited partnership (partnership), income for its 1985 and 1986 taxable years in the amounts of $ 1,534,738 and $ 1,473,348, respectively. The adjustments are attributable to respondent's disallowance of deductions claimed for a charitable contribution. We must decide whether the partnership's conveyances of real property and a convent building in 1985 and 1986 qualify as charitable contributions under section 170[1] and, if so, the fair market value of the property contributed. *85 FINDINGS OF FACT Some of the facts have been stipulated, and the stipulation of facts and attached exhibits are incorporated by this reference. At the time of filing the petition herein, the partnership had its principal place of business in Dobbs Ferry, New York. The partnership was formed on October 8, 1985, to acquire property located in Dobbs Ferry, New York, and to build residential units on the property. At that time, the property was owned by the Institution of Mercy (Corp.), a not-for-profit, eleemosynary corporation wholly owned by the Sisters of Mercy (Sisters), a religious order. The corporation offered approximately 35 [2] acres of land for sale, through a real estate agent, at a $ 7.5 million asking price. The Sisters resided at and operated a nursing home in the Mount Mercy convent building, which was an improvement on the property offered for sale. The convent building and surrounding grounds were situated on approximately 5 acres of land (the convent property). The corporation prescribed certain terms or conditions that were to be included before an offer to purchase the property would be considered. The offer must, to some extent, be paid in cash and the *86 remaining mortgage note would not be subordinated to any other financing. No personal property was to be included in the offer and the Sisters desired continued use of the convent building. The Sisters occasionally attended negotiations or meetings, but the interests of the corporation and the Sisters were represented by lawyers. The corporation had financial needs which motivated its proposal to sell the realty. The primary concerns of the Sisters were to generate some operating funds and to retain use of the convent building in order to carry out their charitable activities. The partnership's Private Placement *87 Memorandum outlined plans to purchase the property from the corporation. There were no plans to develop the convent property. Instead, the partnership intended to build up to 250 luxury condominiums on the remaining unimproved property. It was anticipated and understood that the partnership intended to deed the convent property back to the corporation. The Private Placement Memorandum outlined the tax benefits to the investors attributable to donating the convent property. To maximize the anticipated tax benefits, 50 percent of the convent property was to be donated in 1985 and the remainder in 1986. The negotiated purchase price in the initial draft of the purchase agreement between the corporation and Geygln Corp. (Geygln) (the partnership's initial general partner) was $ 8 million ($ 3,250,000 cash and a $ 4,750,000 purchase money note and mortgage). The corporation received other offers to purchase the property. The offers ranged from $ 6 million to $ 7.5 million and almost all provided for some arrangement under which the Sisters would remain in the convent property. Only one offer did not provide for the Sisters to remain in the convent property. The November 1, 1985, *88 purchase and sale agreement contained a $ 9 million selling price payable $ 2 million at closing; a $ 1 million note and mortgage secured by the convent property; and a $ 6 million note and mortgage secured by the remaining unimproved land. The agreement also stated that upon closing, Geygln would lease the convent property back to the corporation. Geygln assigned its rights and obligations to the partnership under the purchase and sale agreement on November 30, 1985. After the purchase and sale agreement was signed, the partnership renegotiated the provisions of the sale with the corporation. The purchase price remained at $ 9 million but cash to be paid at closing was reduced from $ 2 million to $ 400,000, and the $ 6 million note and mortgage were correspondingly increased to $ 7.6 million. The corporation agreed to subordinate the $ 1 million mortgage note secured by the convent property. During these negotiations, the partnership discussed its intentions to donate the convent property with representatives of the corporation. In November 1985, the partnership hired a real estate appraiser to determine the fair market value of the property. The convent property was appraised *89 separately from the unimproved land. The appraiser opined that the fair market values of the convent property and the remaining unimproved land were $ 4 million and $ 6.9 million, respectively. On December 30, 1985, the corporation conveyed the property to the partnership for $ 9 million under the following terms: $ 80,000 deposit paid November 1, 1985; $ 10,000 additional deposit paid December 1985; $ 310,000 paid December 30, 1985; $ 1 million note and mortgage secured by the convent property; and $ 7.6 million note and mortgage secured by the remaining unimproved property. The $ 7.6 million note and mortgage was nonrecourse and had an interest rate equal to the greater of 10 percent or 2 percent plus the prime commercial rate of The Bank of New York. The $ 1 million note and mortgage was nonrecourse, had no stated interest rate, and was subordinate to all mortgages which existed at the closing or arose thereafter. Payment of the $ 1 million note was due on December 30, 1988. Also on December 30, 1985, the partnership leased the convent property back to the corporation. The lease was for 3 years, with renewals for 7 additional years (maximum of 10 years), at $ 1 per annum *90 rent. Simultaneous with the sale and leaseback, the partnership conveyed to the corporation a 50-percent undivided interest as tenants in common in the convent property. The corporation granted the partnership a right of first refusal with respect to any subsequent sale, lease, transfer, or other conveyance of its interest in the convent property. The partnership claimed a $ 1,534,738 charitable contribution deduction on its 1985 tax return attributable to its conveyance of 50 percent of the convent property to the corporation. On December 24, 1986, the partnership conveyed an additional 48-percent undivided interest, in the convent property, to the corporation as tenants in common. The corporation granted the partnership a right of first refusal, under the same terms as the 50-percent transfer, with respect to its 98-percent undivided interest in the convent property. The partnership retained a 2-percent undivided interest in the convent property. The partnership claimed a $ 1,473,348 charitable contribution deduction on its 1986 tax return attributable to its conveyance of a 48-percent interest in the convent property to the corporation. The $ 1 million nonrecourse note *91 and mortgage secured by the convent property was due on December 30, 1988. As of the due date and through the time of trial, the partnership had not paid any part of the $ 1 million nonrecourse note and the corporation had not demanded payment or attempted to collect on the $ 1 million note. The partnership has paid the principal and monthly interest on the $ 7.6 million mortgage note secured by the remaining unimproved property. As of July 15, 1989, $ 5.6 million of the $ 7.6 million note had been paid by the partnership. At the time of the sale, the entire property was zoned for educational institution use. The partnership sought to change the zoning of the unimproved land to a one family residence district. The partnership did not attempt to change the zoning for the convent property. In its zoning application, the partnership represented that it paid $ 9 million for the unimproved land without reference to the convent property. At all times pertinent herein, the Sisters indicated that they did not intend to leave the convent property and that their intention was to remain indefinitely. During 1986, the Sisters requested a zoning change for the convent property to a convent *92 zone. OPINION The issue for our consideration is whether the partnership was entitled to claim charitable contributions in 1985 and 1986 and, if so, the amount of the contributions. Petitioner bears the burden of proving that the partnership is entitled to the claimed deductions. Rule 142(a). Section 170, in general, allows a deduction for a charitable contribution made during a taxable year. Section 170(c) defines a charitable contribution as a "contribution or gift to or for the use of" an organization as described in that section. Both parties agree that the corporation is such an organization. When a taxpayer contributes property rather than cash, the amount of the charitable contribution deduction is generally the fair market value of the property at the time of the contribution. Sec. 170A-1(c)(1), Income Tax Regs.
A charitable contribution is synonymous with a gift. Sutton v. Commissioner, 57 T.C. 239, 242 (1971). A gift is defined as a voluntary transfer of property motivated by a detached and disinterested generosity. Commissioner v. Duberstein, 363 U.S. 278, 285 (1960). If a transfer is motivated *93 by an anticipated economic benefit from the donee, even if there is no legal or moral obligation, then it is not a gift. Id.; see Hernandez v. Commissioner, 490 U.S. 680, 690-691 (1989). Respondent first argues that the closing documents, on their face, show that the transfer of the convent property to the corporation was a bargained for exchange and an integral part of the entire transaction; therefore, it was not a gift. Respondent contends that the partnership conveyed the convent property in expectation of economic benefits from the corporation; namely the conveyance of the unimproved property. We find that the partnership's primary motivation for conveying the property was to secure a tax deduction. However, this does not result in the disallowance of the deduction. "A charitable contribution may be motivated by the basest and most selfish of purposes as long as the donor does not reasonably anticipate benefit from the donee in return." Weitz v. Commissioner, T.C. Memo. 1989-99 (citing Stubbs v. United States, 428 F.2d 885, 887 (9th Cir. 1970)). "The legal right of a taxpayer *94 to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." Gregory v. Helvering, 293 U.S. 465, 469 (1935) (citations omitted). We do not find that partnership's conveyance of the convent property was in exchange for an economic benefit from the Sisters or the corporation. As a matter of form, the partnership was under no obligation to transfer the convent property, even though it was understood that it intended to do so. The partnership made its intentions clear in its Private Placement Memorandum and during the negotiations for the purchase of the property. This does not automatically disqualify a conveyance from being a gift. The corporation may have expected to receive the property, but, because the partnership had no legal obligation to transfer the convent property, the corporation protected its interests. The protection was in the form of a highly favorable 10-year lease. This 10-year lease, with a nominal stated annual rental, substantially reduced the value of the convent property. In addition, the corporation held a mortgage note secured by the convent property. *95 Even if the partnership had not conveyed the convent property, the Sisters could have remained on the property without interruption. We are unable to find, as respondent argues, that the corporation would not have sold the partnership the property if it had not agreed to transfer back the convent property or that the conveyance was a bargained-for exchange. Respondent next argues that the contribution lacks economic substance. In order to have economic substance, the form of the transaction must comport with the underlying reality. A transaction that lacks economic substance should be disregarded for Federal tax purposes. Gregory v. Helvering, supra."A given result at the end of a straight path is not made a different result because reached by following a devious path." Minnesota Tea Co. v. Helvering, 302 U.S. 609, 613 (1938). Respondent asserts that the underlying reality of the transaction was such that the partnership purchased only the unimproved land and did not purchase the convent property. Respondent contends that the partnership paid $ 8 million for the unimproved land and not $ 9 million for the *96 convent property and the unimproved land. To support that contention, respondent points to the fact that the $ 1 million mortgage note was not paid when due and that payment was not demanded. Further, the partnership, in its zoning application, represented that the $ 9 million was paid for the unimproved land, and the purchase and reconveyance of the convent property was not referenced in the application. Petitioner argues that the convent property was purchased as part of the transaction. Petitioner asserts that because the partnership did not intend to utilize the convent property and instead intended to contribute the property back to the corporation it does not automatically follow that the transaction lacked economic substance. Petitioner relies on Weitz v. Commissioner, supra.In Weitz, the taxpayers purchased medical supplies at a discount, held the supplies for 1 year, and then donated them to a hospital and took a charitable contribution deduction. The transaction was done through an agent and was motivated primarily to secure a tax deduction. The taxpayers did not know what equipment was purchased, where it was stored, or to *97 whom it would ultimately be donated. The Commissioner challenged the deduction claiming that the transaction lacked economic substance. This Court held that the taxpayers were entitled to the charitable contribution deduction after deciding that the transfer of the supplies was a gift, that the agent did represent the taxpayers and not the hospitals, and that the taxpayers were the true owners of the supplies. Weitz v. Commissioner, supra.
The Court in Weitz, as part of its holding that the transaction had economic substance, discussed that the taxpayers had the right to beneficial ownership of the property, although they did not exercise that right. See also Skripak v. Commissioner, 84 T.C. 285, 316 (1985). During the year the taxpayers held the supplies, the hospital that was to receive the supplies could not use the supplies, even though they were stored in the hospital's warehouse. At any time during that year, the taxpayers could have withdrawn from the plan and taken possession of the medical supplies. The partnership here, however, did not intend to take possession of the convent property. Instead, *98 it intended to donate the convent property back to the corporation. The corporation expected to receive the property when the transaction was complete. Simultaneous with the purchase of the property, the convent property was leased for a $ 1 per annum rental and a 50-percent undivided interest in the leased property was also conveyed to the corporation. [3] The following year, the partnership conveyed a 48-percent undivided interest in the convent property. At all relevant times, the Sisters had uninterrupted use and enjoyment of the convent property, and the corporation had at least a 50-percent ownership interest. The partnership did not have or exercise any possessory right to the convent property. In substance, the Sisters and the corporation never lost possession, control, and, in essence, ownership of the convent property. *99 Furthermore, the mortgage note secured by the convent property was not paid, even though all other obligations concerning the transaction were being fully executed. The partnership's representative, in a sworn affidavit attached to its zoning application, represented that it purchased the unimproved land, but not the convent property, for $ 9 million. Evidently the partnership did not allocate any portion of the purchase price or basis to the convent property. Unlike the taxpayers in Weitz, the partnership, in substance, did not become the true owner of the convent property. [4]
*100 The substance of the transaction, considered in its entirety, is that the partnership purchased only the unimproved land for $ 8 million. The $ 8 million purchase price is within the range of the other offers that had been made to acquire the property. Although the face value may appear to be higher than other offers, the offer is comparable especially if one considers the contract modifications reducing the amount of cash up front by $ 1.6 million and deferring payment of that amount for a period of years. The transfer and reconveyance of the convent property was without economic substance, and the partnership did not possess the benefits and burdens of ownership in the convent property. The partnership played on the charitable presence and good reputation of the Sisters to structure a transaction which had the appearance, but not the substance, of a gift to charity. The form of the transaction, if respected, would have allowed the partnership a deduction that was designed merely to reduce its cost of acquiring the unimproved land. [5] *102 We agree with respondent that section 170 was not intended to encourage profit-motivated entities to enter into this type of structured transaction. *101 The partnerhsip's purchase of an unwanted and unnecessary asset with no additional cost to it should not result in a tax benefit where none was actually intended by the statutes or, as a matter of substance, the donee received nothing more than it already possessed. The Sisters made clear their intent to sell the property and also to remain in possession of the convent property to continue their charitable endeavors. They played a passive role in this transaction, except for the acceptance of a sales price and the requirement that they remain in possession. It was the partnership that produced the subterfuge we must ignore. Therefore, we find that the contribution lacked economic substance, and the partnership is not entitled to charitable deductions for 1985 and 1986. [6]
Decision will be entered for respondent.
Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. Some documents presented at trial indicate that there were approximately 44 acres plus the convent property sold to the partnership. Approximately 15 acres of the property were situated on the Hudson River. Therefore, there were approximately 35 acres of usable property offered for sale. We note that the different references to the amount of property exchanged does not affect our decision in this case.↩
3. Even if the partnership had failed or refused to convey the convent property, its value was substantially decreased because of the bargain lease to the corporation. We further note that the bargain lease was not a gift or contribution because it was bargained for and became part of the legal obligations of the parties. Therefore, the convent property had little commercial value and the only way the transaction makes sense is if the partnership gave the land to the corporation.↩
4. Some indications of ownership include: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. * * *
Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237-1238↩ (1981) (citations omitted).
5. With the expected charitable contribution deductions, the investors expected to pay less than $ 8 million for the unimproved land. Assuming a 50-percent top marginal rate for the investors, they may have expected the deductions to yield an additional $ 1.5 million. Considering the tax effect, the partnership would have only paid $ 6.5 million for the unimproved property, which is less than the $ 6.9 million fair market value estimated by the real estate appraiser the partnership hired before it entered into the transaction.↩
6. Having found that the claimed contribution lacked substance, it is unnecessary to decide the fair market value of the convent property at the time of the alleged gift.↩