T.C. Memo. 1999-401


UNITED STATES TAX COURT


SAMUEL JACOBSON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 20493-97.                    Filed December 9, 1999.


<u>Wallace Musoff</u> and <u>Michael J. Coyle</u>, for petitioner.

<u>Moira L. Sullivan</u>, <u>Timothy V. Mulvey</u>, and <u>Vincenza Taverna</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Chief Judge</u>:  Respondent determined deficiencies, an addition to tax, and penalties as follows:

| | | Addition to Tax and Penalties, I.R.C. | |
| | | Sec. | Sec. |
| Year | Deficiency | 6651(a)(1) | 6662(h) |
| 1993 | $178,093 | $10,734 | $71,237 |
| 1994 | 192,586 | -- | 77,034 |

Respondent, in the alternative, determined a negligence penalty under section 6662(c). Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for decision are whether petitioner is entitled to certain noncash charitable contribution deductions in excess of the amounts allowed by respondent, whether petitioner is liable for an addition to tax for failure to file timely his 1993 Federal income tax return, and whether petitioner is liable for penalties for gross valuation misstatements on his 1993 and 1994 Federal income tax returns.

FINDINGS OF FACT

Some of the facts have been stipulated, and the facts set forth in the stipulation are incorporated in our findings by this reference. At the time the petition in this case was filed, Samuel Jacobson (petitioner) was a resident of New York, New York. He has been in the baked goods distribution business for 30 years and owns Operative Cake Corporation (Operative Cake).

Philately

"Philately" is the collection and study of postage stamps (stamps) and of postal stationery that has passed through the mail.  When a new U.S. stamp is issued by the United States Postal Service (Postal Service), it is released on a specific day at a specific location.  Stamp collectors refer to that day as the "first day of issue".  Since about 1930, a special cancellation bearing the words "FIRST DAY OF ISSUE" along with the date and town of issue has been applied to stamped items furnished to the Postal Service on the first day the stamp is issued.  This service is undertaken by the Postal Service at no charge, other than the cost of postage.

One of the modes of collecting first day of issue stamps is the collection of "first day covers".  A first day cover is an envelope that bears a stamp postmarked with a first day of issue cancellation.  In some instances, the envelope includes a decorative design usually related to the subject matter of the applied stamp.  By the 1940's, hundreds of thousands of first day covers were routinely prepared by collectors for every newly issued stamp, and first day covers had become an important part of the hobby of stamp collecting.

There is a primary market and a secondary market for first day covers.  The primary market refers to current first day covers (with newly issued stamps) sold directly to customers by

the manufacturer. Prices in this market are set by the manufacturer and vary widely depending upon the quality of the products and the method of sale. The secondary market refers to those first day covers sold by traditional stamp dealers, who are not manufacturers or publishers of first day covers. The secondary market operates through local shops, mail-order catalogs, and trade shows. This market can be either at the retail level or wholesale level, and prices are generally determined by the laws of supply and demand.

In addition to first day covers, there are other "first day of issue" collectibles, including first day pages. First day pages are similar to first day covers but vary slightly in size and format. For example, rather than using the envelope format of a first day cover, the format of a first day page might be a photograph, a dinner menu, a diploma reprint, or copies of congressional minutes. Affixed to the first day page is a first day of issue stamp that is typically related to the subject matter of the page.

<u>Charitable Contribution</u>

Petitioner acquired 60,484 first day pages from Rita Ostrer (Ostrer) of the Historic Philatelic Document Company. The first day pages (the Kesslers) were created by Seymour Kessler and included prints, photographs, and other documentary material depicting various events and scenes of historical significance.

Theme-appropriate first day of issue stamps were affixed to each page.

Ostrer also owned an art dealership known as Nicolini's that rented art to movie studios. Petitioner acquired from Nicolini's 62 10-volume sets of "Figures of the Bible", a painting entitled "St. Peter as Bishop", a painting entitled "Madonna and Christ Child", and a monstrance. (Hereinafter these articles will be referred to collectively as the religious articles, and the religious articles and the Kesslers will be referred to as the contributed property.)

During the time that he owned the contributed property, which he estimates as 20 to 30 years, petitioner never attempted to obtain insurance on the contributed property. He never attempted to sell the property. He stored the contributed property in boxes on pallets in the Operative Cake bakery warehouse. The warehouse had a rodent problem and was very hot during the summer. Twelve to fifteen people worked in the warehouse. The only security was a guard at the exit of the warehouse.

In 1993, Bishop John Peter Walzer (Walzer) of The Anglican Catholic Church, Diocese of Connecticut, Southern Episcopal Church (diocese) visited petitioner seeking donations. Petitioner met with Walzer several more times to discuss a potential contribution. On November 29, 1993, Gerald Malina

(Malina) prepared a document valuing the religious articles for petitioner. Malina, however, provided no methodology or rationale for the values at which he arrived.

Walzer provided to petitioner letters dated December 27, 1993, acknowledging receipt of a $7,000 cash contribution and the religious items. Each letter contained a sentence stating: "We welcome the opportunity to work with you to help maximize your charitable contribution on your Schedule A, form 1040, and thank you again for your generosity to our Diocesan Programs."

In a letter dated April 4, 1994, Walzer acknowledged receipt of the Kesslers, stating that the donation of the Kesslers was made on October 1, 1993. This correspondence also included an inventory of the Kesslers that was prepared by Donald C. Brueggemann (Brueggemann). The Brueggemann inventory placed a value on each Kessler and indicated that the total value of all of the Kesslers was $900,430. The inventory did not contain any valuation methodology, any rationale for the prices quoted, or any reference to comparable sales. It provided only a description of the Kesslers on a lot-by-lot basis.

Petitioner filed Federal income tax returns for 1993 and 1994 on September 30, 1994, and October 17, 1995, respectively. On his 1993 return, petitioner reported adjusted gross income of $1,555,648. He claimed charitable contributions of $13,997 in cash and $949,030 in noncash property to the diocese. Petitioner

represented that he purchased the Kesslers on June 1, 1976, at a cost of $135,065. He stated "various" as the acquisition date of each of the religious items and did not state a cost for any of them. Petitioner listed the fair market values of the contributed property on Form 8283 as follows:

| Item | Claimed Fair Market Value |
|---|---|
| Kesslers | $900,430 |
| Biblical books | 18,600 |
| St. Peter painting | 15,000 |
| Madonna painting | 5,000 |
| Monstrance | 10,000 |
| Total | $949,030 |

No appraisal was attached to petitioner's 1993 or 1994 Federal income tax returns substantiating the fair market values claimed by petitioner. The charitable contribution deduction claimed for 1993 was limited to $476,700, with the remaining $486,327 attributable to noncash items being carried forward and deducted on the 1994 Federal income tax return.

In the statutory notice, respondent allowed only $12,973 as the fair market value of the donated noncash property. Thus, respondent disallowed $449,730 of petitioner's charitable contributions for 1993 and all of the $486,327 charitable contribution carryover for 1994.

OPINION

Fair Market Value

Section 170(a)(1) allows a deduction for charitable contributions made to an organization described in section 170(c). In general, the amount of a charitable contribution made in property other than money is the fair market value of the property at the time of the contribution. See sec. 1.170A-1(c)(1), Income Tax Regs. Fair market value is defined as "on the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs; United States v. Cartwright, 411 U.S. 546 (1973). Fair market value is a question of fact to be determined from the entire record. See Skripak v. Commissioner, 84 T.C. 285, 320 (1985).

Petitioner argues that the cumulative fair market value of the contributed property in 1993 was $949,030. Petitioner bears the burden of proving a higher value than that determined by respondent. See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Petitioner was unable to produce canceled checks, sales receipts, or other documents that substantiated the price that he paid or the date that he purchased the Kesslers. Petitioner was unable to provide records substantiating the price that he paid or the date that he purchased the religious articles. At trial,

petitioner was unable to remember when he purchased the contributed property, how much he paid for it, and when he donated it. Petitioner's recollection of the amounts paid was vague and unreliable. He claimed on his return that he purchased the Kesslers in 1976, but he testified at trial that the correct year was 1981. He asserted in responses to interrogatories that he had purchased property 20 or 30 years earlier. An employee of the bakery testified that the boxes were in the warehouse for "at least 16 years".

Malina prepared an expert report for trial that purportedly valued the contributed property, and petitioner relies on this report and his own personal experience in valuing the contributed property. Respondent relies on the expert report of Paul T. Schmid (Schmid) to support the fair market values determined in the notice of deficiency.

Opinion testimony of an expert is admissible if and because it will assist the trier of fact to understand evidence that will determine a fact in issue. See Fed. R. Evid. 702. We evaluate the opinions of experts in light of the demonstrated qualifications of each expert and all other evidence in the record. See Parker v. Commissioner, 86 T.C. 547, 561 (1986). We are not bound by the opinion of an expert witness, especially when such opinion is contrary to our conclusions. See IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991). If experts

offer divergent estimates of fair market value, we decide the weight to give these estimates by examining the factors they used in arriving at their conclusions. See Casey v. Commissioner, 38 T.C. 357, 381 (1962). We may reject in its entirety an opinion provided under circumstances that undermine its credibility. See, e.g., Snyder v. Commissioner, 86 T.C. 567, 584-585 (1986); Chiu v. Commissioner, 84 T.C. 722 (1985); Dean v. Commissioner, 83 T.C. 56, 75 (1984).

Malina has been a member of the Appraisers Association of America, Inc., since 1964 with a specialty in Oriental art. His investigation of the Kesslers consisted of telephone conversations with Seymour Kessler, a review of trade periodicals offering Kesslers for retail sale, and a review of the Brueggemann inventory. Malina erroneously referred to the Kesslers as "covers"--unaware of or ignoring the distinction between covers and pages. He also claims to have analyzed the market for first day covers. In his report, he listed the Kesslers, assigning a value to each lot. Malina's analysis was limited to an unsupported assertion that respondent's examining agent significantly undervalued the Kesslers and to his contention that the Kesslers were valuable because they were suitable for framing.

With respect to the religious articles, Malina adopted the values set forth in his 1993 valuation. He provided only a

limited analysis of his valuation of the "Stories of the Bible" book sets and no analysis of his valuation of the religious articles.

We reject Malina's opinion because he gave no persuasive explanation of his methodology, made no reference to comparable sales or a valuation rationale, and made no reference to any experience he had that would support the values at which he arrived. Without any reasoned analysis, his report is useless. His opinions are so exaggerated that his testimony is not credible. See Dean v. Commissioner, supra. The record is devoid of any evidence of actual sales of any of the Kesslers or other objective evidence supporting the values claimed by Malina and petitioner or any substantial values for the contributed property.

Moreover, the fair market values at which Malina arrived are contradicted by the objective evidence in this case. Petitioner argues that we should rely on his representations of the value of the Kesslers because he examined the market for Kesslers. He recalled no details of his alleged activity in this regard, however. We are not required to accept petitioner's testimony and, under all of the circumstances, conclude that it is unworthy of belief. The contributed property was stored in boxes on pallets for many years in a bakery warehouse that only had limited security. The warehouse had a rodent problem and was

described as being extremely hot during the summer.  The contributed property was not insured, nor was any special precaution taken to preclude loss due to deterioration, theft, or fire.  Petitioner's contemporaneous conduct renders implausible his claim that the property had substantial value.  See Chiu v. Commissioner, supra at 736.  The only evidence of subsequent handling of the contributed property suggests that it had little value.  See Skripak v. Commissioner, 84 T.C. at 322-323.  If the contributed property had a value of $949,030 or anything approaching that value, as petitioner claims, petitioner would have treated it with more care.

Respondent's expert, Schmid, has been involved with stamps on a full-time basis for 32 years.  His experience includes retail and auction sales, and he has authored two books on the authentication of U.S. stamps.  At the time of the trial, Schmid was the owner of Colorano, a major publisher of first day covers in the United States.  Schmid provided a careful explanation supporting his opinions of value.

Schmid described the pricing structure of first day covers within the primary and secondary markets and indicated that the prices of first day covers were in the following ranges:

|  | Primary Market | Secondary Market |
|---|---|---|
| Retail | $1.00 - $3.00 | $0.35 - $2.00 |
| Wholesale | 0.65 - 1.65 | 0.15 - 0.35 |

Schmid stated that the drop in price from the primary market to the secondary market is attributable to tremendous oversupply. Schmid indicated, however, that these prices are not necessarily the most accurate picture of fair market value and that many other factors combine to determine fair market value, including sales history and collector demand.

Schmid attempted but was unable to identify documented sales of the Kesslers. Analyzing the demand for Kesslers, Schmid pointed out that the demand for first day pages was much less than the demand for first day covers. Because Schmid was unable to identify a competitive market for Kesslers within which to ascertain an appropriate fair market value, he estimated fair market value using the first day cover market.

In arriving at fair market value, Schmid took into consideration that the Kesslers do not conform to the more popular envelope format, they only span a limited number of years, there is no established collector following, and no past sales history was available. He also considered that the Kesslers are unique first day products and would have some appeal within the overall market for first day collectibles. Accordingly, he stated that the Kesslers would likely trade in secondary markets for first day covers for the same period, thus indicating a range of $1 to $2 on an individual basis and $0.35 to $.59 in larger groups.

He also took into consideration the salability of the Kesslers, noting that some of the pages would not be sold. He proposed the following approach to valuing the Kesslers:

| Sales Level | Price | Percent of Lot | Sales |
| --- | --- | --- | --- |
| High retail | $2.00 | 5 | $ 6,050 |
| Low retail | 0.35 | 10 | 2,118 |
| High wholesale | 0.35 | 10 | 2,118 |
| Low wholesale | 0.15 | 65 | 5,899 |
| Unsalable | -- | 10 | -- |
| Total | | | $16,185 |

Schmid indicated that these estimates are for a competitive market. Schmid stated that a noncompetitive market would have more "high retail" sales but would have fewer opportunities overall for sales at all levels, resulting in a return in the range of $15,000 to $20,000. He suggested that the bottom of this range was more realistic based on his experience with established dealers.

Schmid stated, however, that the most accurate valuation of the Kesslers would be in the wholesale market where the Kesslers would likely sell for $0.07 to $0.15 per page. Under this assumption, the value of the Kesslers would be between $4,200 and $9,000.

Petitioner challenges Schmid's valuation of the Kesslers on a wholesale basis because, he asserts, trade periodicals indicated that a retail market existed for the Kesslers. Petitioner's reliance on trade periodicals to establish a market

for the Kesslers is misplaced.  There is no evidence that any sales took place at the prices listed in those periodicals.  We are convinced that 60,484 Kesslers would likely be sold, if at all, only in a wholesale market.

Based on Schmid's experience in stamp collecting and in the first day cover market, his valuation of the Kesslers is the best evidence we have of fair market value, and it supports respondent's determination.

Respondent presented no expert evidence of fair market value for the religious articles, offering only evidence that they were not treated as valuable by subsequent possessors of the articles. Petitioner, however, failed to establish a fair market value in excess of $12,973 for all of the contributed property. Accordingly, we conclude that petitioner is not entitled to deductions in excess of the amounts allowed by respondent.

Section 6651(a) Addition to Tax

Respondent determined that petitioner is liable for the section 6651(a)(1) addition to tax for 1993.  Section 6651(a)(1) imposes an addition to tax for failure to file timely a return, unless the taxpayer establishes that the failure did not result from "willful neglect" and that the failure was due to "reasonable cause".

Petitioner failed to offer any evidence or explanation regarding the late filing of his 1993 return.  Thus, respondent's

determination that petitioner is liable for the section 6651(a)(1) addition to tax for 1993 is sustained.

## Section 6662(h) Penalty

Respondent determined that petitioner is liable for the accuracy-related penalty under section 6662(h) for 1993 and 1994. Petitioner argues that he reasonably relied on the Brueggemann inventory and Malina's appraisal and that he substantially complied with applicable requirements.

Taxpayers are liable for a penalty equal to 40 percent of the portion of an underpayment of tax attributable to a gross valuation misstatement. See sec. 6662(a), (h). Section 6662(h)(2)(A) provides that there is a gross valuation misstatement if the value of any property claimed on a tax return is 400 percent or more of the amount determined to be the correct value. See also sec. 6662(h)(2)(A), (e)(1)(A). In this case, the value of the contributed property that was claimed on petitioner's Federal income tax return, $949,030, exceeds 400 percent of the value determined to be correct, $12,973.

The accuracy-related penalty under section 6662(h) does not apply to any portion of an underpayment if the taxpayer shows that there was reasonable cause for such portion and that the taxpayer acted in good faith. See sec. 6664(c)(1). However, the good faith exception applies only to a section 170 deduction if (1) the claimed value of the property was based on a "qualified

appraisal" made by a "qualified appraiser" and (2) in addition to obtaining such an appraisal, the taxpayer made a good faith investigation of the value of the contributed property.  See sec. 6664(c)(2) and (3).

Qualified appraisers and qualified appraisals are defined under the regulations in section 170(a)(1).  See sec. 6664(c)(3); sec. 1.170A-13(c)(3), Income Tax Regs.  Among the items of information to be included on a qualified appraisal is the method of valuation used to determine fair market value and the specific basis for the valuation, such as comparable sales or statistical samples.  See sec. 1.170A-13(c)(3)(ii)(J) and (K), Income Tax Regs.  As we indicated above, neither the Brueggemann inventory nor Malina's 1993 appraisal set forth a methodology or any meaningful analysis of fair market values expressed in each report.  Moreover, we are not persuaded that petitioner acted in good faith, because his conduct with respect to the contributed property was not consistent with a belief that it had substantial value.  Thus, the reasonable cause exception does not apply, and petitioner is liable for the accuracy-related penalty of section 6662(h) for a gross valuation misstatement.

To reflect the foregoing,

Decision will be entered

for respondent.