10-3587 (L)
Scheidelman v. Commissioner of Internal Revenue

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2011

(Argued: December 15, 2011     Decided: June 15, 2012)

Docket Nos. 10-3587-ag(L), 10-5316-ag(XAP)

- - - - - - - - - - - - - - - - - - - - - -x

HUDA T. SCHEIDELMAN,

> Petitioner-Appellant-Cross Appellee,

- v.-

COMMISSIONER OF INTERNAL REVENUE,

> Respondent-Appellee-Cross Appellant.[*]

- - - - - - - - - - - - - - - - - - - - -x

Before:       JACOBS, Chief Judge, LEVAL and
              LIVINGSTON, Circuit Judges.

Taxpayer appeals a decision of the Tax Court (Cohen, J.) that disallowed her deduction for donating a "facade conservation easement," on the ground that there was no "qualified appraisal" within the meaning of Treasury Regulation § 1.170A-13(c)(3). We conclude that the appraisal satisfied the regulatory specifications.

---

[*] The Clerk of Court is respectfully directed to amend the caption as listed above.

Accordingly, the decision of the Tax Court is vacated and the case remanded for further proceedings.

FRANK AGOSTINO (Eduardo S. Chung, on the brief), Agostino & Associates, P.C., Hackensack, N.J., for Petitioner-Appellant-Cross Appellee.

PATRICK J. URDA (Kenneth L. Greene, on the briefs), for Gilbert Rothenberg, Acting Deputy Assistant Attorney General, U.S. Department of Justice, Washington, D.C., for Respondent-Appellee-Cross Appellant.

DENNIS JACOBS, Chief Judge:

Taxpayer Huda Scheidelman appeals a decision of the Tax Court disallowing her deduction for the value of a "facade conservation easement" that she donated to the National Architectural Trust (the "Trust"). The Tax Court ruled that the appraisal she obtained insufficiently explained the method and basis of valuation, and thereby failed to comply with the Treasury Regulation defining a qualified appraisal. See Treas. Reg. § 1.170A-13(c)(3). We conclude that the appraisal sufficiently detailed the method and basis of valuation. The Tax Court also disallowed her deduction for a cash contribution she made to the Trust on the ground that it was *quid pro quo* for the Trust's acceptance of the easement. We disagree because the Trust's agreement to

accept the gift of the easement was not a transfer of anything of value to the taxpayer and thus did not constitute a *quid pro quo* for the gift of the cash.

Accordingly, we vacate the decision of the Tax Court and remand the case for further consideration consistent with this opinion.

**BACKGROUND**

A facade conservation easement is an undertaking by a property owner, granted to an organization, that a building's facade will be maintained unchanged in perpetuity. Such an easement is designed to protect the historical integrity of properties and communities. Congress has created a tax benefit for taxpayers willing to donate property rights for conservation purposes, including the right to alter a property's facade. See 26 U.S.C. § 170(f)(3)(B)(iii).

In early 2003, Scheidelman submitted an application to the Trust to donate a facade conservation easement for her brownstone row house in Brooklyn's historic Fort Greene neighborhood. The easement would prohibit Scheidelman from altering the facade without permission of the Trust and

3

would require her to maintain the facade and the rest of the structure. The easement would give the Trust the right to inspect the facade and to require Scheidelman to cure any violation of her easement obligation. It would run with the land in perpetuity.

In order to complete the donation process (and obtain the associated tax benefit), Scheidelman needed to have the easement appraised. She hired Michael Drazner, a qualified real estate appraiser. Drazner valued the easement at $115,000. He employed the "before-and-after method," which, as the name suggests, subtracts the value of a house burdened with an easement from the value of the house without one. Drazner estimated the unencumbered value of Scheidelman's property at $1,015,000, a figure the parties do not dispute. He estimated the value of the property after the granting of the easement at $900,000, yielding an easement value of $115,000. This appeal concerns primarily the bases for the $900,000 *after* valuation, which he arrived at by applying an 11.33 percent reduction to the pre-easement value.

After receiving Drazner's appraisal, the Trust notified Scheidelman that each of the Trust's easement donors must

4

make a cash contribution toward operating costs equivalent to ten percent of the value of the easement. Sheidelman remitted a check for $9,275, which represented ten percent of the value of the easement less adjustments irrelevant to this appeal. The Trust then sent Scheidelman an IRS form for noncash charitable contributions (Form 8283), signed by Drazner and the Trust, reflecting a fair market value for the easement of $115,000.

Scheidelman claimed a $115,000 deduction on her federal tax return for the 2004 tax year. Pursuant to IRS rules, Scheidelman had to carry over $63,083 to future years ($59,959 in 2005 and $3,124 in 2006). After an audit, the IRS decided that she failed to establish a fair market value for the easement; notified her of resulting deficiencies in her taxes of $16,873, $17,537, and $1,015 for the years 2004 through 2006, respectively; and imposed a statutory penalty of $3,374.60, $3,507.40, and $203.00 for each year, respectively.

Scheidelman sought a redetermination of her tax liability from the Tax Court. The Tax Court found that Scheidelman was ineligible for the deduction because the Drazner appraisal was not a "qualified appraisal"--a

5

prerequisite for deducting a noncash charitable contribution--because it failed to state the method of valuation and the basis of valuation, as required by Treasury Regulation § 1.170A-13(c)(2)(J) & (K). Scheidelman v. Comm'r, 100 T.C.M (CCH) 24, 2010 WL 2788205, at *8-9 (2010); see 26 U.S.C. § 170(f)(11)(A) & (C). The Tax Court therefore did not go on to determine the value of the easement de novo, which it would have done had it found that Scheidelman satisfied the prerequisites for claiming the deduction.

The Tax Court also rejected Scheidelman's attempt to deduct her cash contribution to the Trust.[2] Citing the principle that "a charitable gift or contribution must be a payment made for detached and disinterested motives," Graham v. Comm'r, 822 F.2d 844, 848 (9th Cir. 1987), aff'd sub nom. Hernandez v. Comm'r, 490 U.S. 680 (1989), it reasoned that Scheidelman had made the donation for the purpose of inducing the Trust to accept her easement so that she could enjoy a tax benefit. Scheidelman, 2010 WL 2788205, at *13.

---

[2] Although Scheidelman did not originally take a $9,275 deduction for her 2004 cash contribution, the parties agreed to permit the Tax Court to adjudicate the deductibility of the cash donation as well.

6

**DISCUSSION**

We review the legal rulings of the Tax Court <u>de novo</u> and its factual determinations for clear error. <u>See</u> 26 U.S.C. § 7482(a)(1) ("The United States Court of Appeals . . . shall . . . review the decisions of the Tax Court . . . in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury."). "[W]e owe no deference to the Tax Court's statutory interpretations, its relationship to us being that of a district court to a court of appeals, not that of an administrative agency to a court of appeals." <u>Madison Recycling Assocs. v. Comm'r</u>, 295 F.3d 280, 285 (2d Cir. 2002) (internal quotation marks omitted). Mixed questions of law and fact are reviewed for clear error.[3] <u>See</u> <u>Wright v. Comm'r</u>, 571 F.3d 215, 219 (2d Cir. 2009); <u>Merrill Lynch & Co. v. Comm'r</u>, 386 F.3d 464, 469 (2d Cir. 2004); <u>Bausch & Lomb Inc. v. Comm'r</u>, 933 F.2d 1084, 1088 (2d Cir. 1991).

---

[3] This approach may be in tension with the statutory text, which requires us to review Tax Court decisions "in the same manner and to the same extent as decisions of the district courts." 26 U.S.C. § 7482(a)(1); <u>see</u> <u>Robinson Knife Mfg. Co. v. Comm'r</u>, 600 F.3d 121, 124 (2d Cir. 2010). But as in <u>Robinson Knife</u>, we have no reason to resolve the tension because our conclusion would be the same under any standard of review.

7

Normally a taxpayer may not take a deduction for the contribution of a partial interest in property.  See 26 U.S.C. § 170(f)(3)(A).  However, there is an exception for, *inter alia*, "a qualified conservation contribution," id. § 170(f)(3)(B)(iii), which is a contribution "(A) of a qualified real property interest, (B) to a qualified organization, (C) exclusively for conservation purposes," id. § 170(h)(1).  One such conservation purpose, "the preservation of an historically important land area or a certified historic structure," id. § 170(h)(4)(A)(iv), encompasses facade conservation easements, see Simmons v. Comm'r, 98 T.C.M. (CCH) 211, 2009 WL 2950610, at *3-4 (2009).

A taxpayer deducting the value of a donated facade conservation easement must first obtain a "qualified appraisal" of the partial interest donated--a requirement left to the Secretary of the Treasury for further explication.  See 26 U.S.C. § 170(f)(11)(C); Treas. Reg. § 1.170A-13(c)(2)(i)(A).  The regulatory requirements of a

8

qualified appraisal are many, as set forth in the margin,[4]

[4] Treasury Regulation § 1.170A-13(c)(3)(ii) enumerates eleven items that a qualified appraisal must include:

(A) A description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed;

(B) In the case of tangible property, the physical condition of the property;

(C) The date (or expected date) of contribution to the donee;

(D) The terms of any agreement or understanding entered into (or expected to be entered into) by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed; . . .

(E) The name, address, and . . . the identifying number of the qualified appraiser; . . .

(F) The qualifications of the qualified appraiser who signs the appraisal, including the appraiser's background, experience, education, and membership, if any, in professional appraisal associations;

(G) A statement that the appraisal was prepared for income tax purposes;

(H) The date (or dates) on which the property was appraised;

(I) The appraised fair market value (within the meaning of § 1.170A-1(c)(2)) of the property on the date (or expected date) of contribution;

(J) The method of valuation used to determine the fair market value, such as the income approach, the market-data approach, and the replacement-cost-less-depreciation approach; and

but generally require information about the property, terms of the donation, identity of the appraiser, and fair market value of the donation. We are concerned here only with clauses (J) and (K), which require that the appraisal specify the method and basis:

> (J) The method of valuation used to determine the fair market value, such as the income approach, the market-data approach, and the replacement-cost-less-depreciation approach; and
>
> (K) The specific basis for the valuation, such as specific comparable sales transactions or statistical sampling, including a justification for using sampling and an explanation of the sampling procedure employed.

Treas. Reg. § 1.170A-13(c)(3)(ii)(J) & (K).

Scheidelman was required to obtain an appraisal before claiming the deduction, but at the time it was sufficient to submit a summary of the appraisal (Form 8283) with her tax return, not the appraisal itself. See Treas. Reg. § 1.170A-13(c)(2)(i) (requiring taxpayers to "[o]btain a qualified appraisal" but "[a]ttach a fully completed appraisal summary" to their tax returns); Instructions to Form 8283 (Revised Oct. 1998), at 3 ("Generally, you do not need to attach the appraisals but you should keep them for your

---

(K) The specific basis for the valuation, such as specific comparable sales transactions or statistical sampling, including a justification for using sampling and an explanation of the sampling procedure employed.

10

records."). The IRS has since changed this practice and now requires appraisals to be submitted with tax returns. See Instructions to Form 8283 (Revised Dec. 2006), at 5. Unlike a qualified appraisal itself, the summary Form 8283 requires no information about how the fair market value of the donated property was determined, only a description of the property, the estimated fair market value, and information about the appraiser's qualifications and compensation. See Treas. Reg. § 1.170A-13(c)(4)(ii).

## B

The first defect identified by the Tax Court was that Drazner omitted "[t]he method of valuation used to determine the fair market value, such as the income approach, the market-data approach, and the replacement-cost-less-depreciation approach." Treas. Reg. § 1.170A-13(c)(3)(ii)(J).

The before-and-after method used by Drazner is an accepted means of valuing conservation easements. The purpose of an appraisal is to determine the "fair market value" of the donated property, which is "the price at which the property would change hands between a willing buyer and

a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Id. § 1.170A-1(c)(2). The before-and-after method is generally used if no substantial record of market-place data is available:

> If no substantial record of market-place sales is available to use as a meaningful or valid comparison . . . the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction.

Id. § 1.170A-14(h)(3)(i); see also Comm'r v. Simmons, 646 F.3d 6, 11-12 (D.C. Cir. 2011) (affirming Tax Court decision holding that a before-and-after facade conservation easement valuation was a qualified appraisal); Nicoladis v. Comm'r, 55 T.C.M. (CCH) 624, 1988 Tax Ct. Memo LEXIS 187, at *11 (1988) ("When faced with [the valuation of facade easements] before[,] we have acknowledged, with approval, that the 'before and after approach' is the most feasible method of valuing such a donation."); Hilborn v. Comm'r, 85 T.C. 677, 688 (1985) (observing that the before-and-after approach is approved by Congress and the IRS); S. Rep. No. 96-1007, at 14-15 (1980) ("[B]ecause markets generally are not well established for easements or similar restrictions . . . .

12

conservation easements are typically (but not necessarily) valued indirectly as the difference between the fair market value of the property involved before and after the grant of the easement."). The Commissioner has not challenged Drazner's conclusion that there was insufficient market data to support other valuation methods.

Drazner's appraisal proceeded as follows. After some boilerplate,[5] the appraisal considers the IRS's past treatment of facade conservation easements:

> It is now generally recognized by the Internal Revenue Service that the donation of a facade easement of a property results in a loss of value . . . of between 10% and 15%. The donation of a commercial property results in a loss of value of between 10% or 12% or higher if development rights are lost. The inclusive data support at least these ranges, depending on how extensive the facade area is in relation to the land parcel.

JA 184. The "inclusive data" is not identified. The appraisal does, however, rely on a Tax Court case that

---

[5] Drazner recited that a precise estimate of the diminution in value caused by the easement cannot be made because of a lack of market data (and because every property is unique); the process of valuing easements is akin to evaluating the effect of a condemnation of a partial interest in a property by a sovereign insofar as the appraiser must ascertain what rights have been taken and what their value is; and that the appraiser must "place himself in the mindset of competent buyers and sellers and to examine considerations they have actually had, or are likely to have, in the buying or selling of a property encumbered by a facade easement." Joint Appendix ("JA") 184.

13

values a facade conservation easement at ten percent of the property value, see Hilborn, 85 T.C. at 700-01, and a government-published article (the "Primoli article") reporting that "Internal Revenue Service engineers have concluded that the proper valuation of a facade easement should range from approximately 10% to 15% of the value of the property."[6]  Drazner narrowed the range to 11 to 11.5 percent by considering the location of the property in New York City and the existing restraints imposed by the City's historic preservation laws.  JA 183 ("For most attached row properties in New York City, where there are many municipal regulations restricting changes to properties located in historic districts, the facade easement value tends to be about 11-11.5% of the total value of the property.").

Drazner then expressly selected the before-and-after method.  He first used comparable sales to calculate a baseline value for the property ($1,015,000).  To arrive at the after value, he applied an 11.33 percent discount to the

---

[6] The article Drazner relied on, "Facade Easement Contributions" by Mark Primoli, was written as part of an IRS program focusing on specialized areas of tax law.  The Primoli article, in turn, had relied upon a 1994 IRS "Audit Technique Guide," used to train tax examiners but not intended to set IRS policy.  In 2003 both the Audit Technique Guide and a revised version of Primoli's article omitted any reference to the ten to fifteen percent range for fear the numbers were being misconstrued.

14

original value.  <u>Id.</u>  The difference is given as the value of the easement.  <u>See</u> Treas. Reg. § 1.170A-14(h)(3)(i) & (h)(4)(Example 12); <u>Nicoladis</u>, 1988 Tax Ct. Memo LEXIS 187, at *23.  This was enough to explain "[t]he method of valuation used to determine the fair market value" of the property.

The Tax Court concluded that there was no method of valuation because "the application of a percentage to the fair market value before conveyance of the facade easement, without explanation, cannot constitute a method of valuation."  <u>Scheidelman</u>, 2010 WL 2788205, at *9.  We disagree.  Drazner did in fact explain at some length how he arrived at his numbers.  For the purpose of gauging compliance with the reporting requirement, it is irrelevant that the IRS believes the method employed was sloppy or inaccurate, or haphazardly applied--it remains a method, and Drazner described it.  The regulation requires only that the appraiser identify the valuation method "used"; it does not require that the method adopted be reliable.[7]  By providing

---

[7] Although one could argue that the IRS's interpretation of its own regulations may be entitled to some deference under <u>Auer v. Robbins</u>, 519 U.S. 452, 461 (1997), the Commissioner failed to argue for such deference and we deem the argument forfeited.  <u>See</u> <u>Robinson Knife</u>, 600 F.3d at 134 n.11.  In any event, the Commissioner's interpretation, that an unreliable method is no method at

the information required by the regulation, Drazner enabled the IRS to evaluate his methodology.

## C

The second defect identified by the Tax Court is that the appraisal failed to "include . . . [t]he specific basis for the valuation, such as specific comparable sales transactions or statistical sampling, including a justification for using sampling and an explanation of the sampling procedure employed." Treas. Reg. § 1.170A-13(c)(3)(ii)(K). The Tax Court's specific criticism is that the valuation lacked "meaningful analysis," failed to "explain how the specific attributes of the subject property led to the value" assigned, and "displayed no independent or reliable methodology." Scheidelman, 2010 WL 2788205, at *9-11.

The business end of Drazner's analysis is the 11.33 percent loss in value he attributed to the easement. We conclude that he sufficiently supplied the bases for the valuation: IRS publications (since removed from circulation), tax court decisions, Drazner's past valuation

all, goes beyond the wording of the regulation, which imposes only a reporting requirement.

16

experience, and the location of the house in the regulatory environment of New York City. The Primoli article and the Hilborn case yielded the initial range of 10 percent to 15 percent diminution in value; whether that range is accurate or reliable is not at issue on this appeal. He then considered the location of Scheidelman's row house in New York City, "where there are many municipal regulations restricting changes to properties located in historic districts" that tend to limit the incremental loss in value to a range of about 11 to 11.5 percent of the total value of the property.

Drazner's approach is nearly identical to that approved by the Tax Court in Simmons v. Commissioner, 98 T.C.M. (CCH) 211, 2009 WL 2950610 (2009), aff'd, 646 F.3d 6 (D.C. Cir. 2011). Simmons concerned an appraisal of facade conservation easements for row houses in Washington, D.C.; the appraisals "adequately describe[d] the parcels of land owned by petitioner and the structures built thereon," "contain[ed] lengthy discussions of historic preservation easements in general," and "identif[ied] the method of valuations used and the basis for the valuation reached." Id. at *7. True, the Simmons appraisals also contained "statistics gathered by [the preservation trusts] that [the

17

appraiser] took into account in preparing the appraisals."
Id.  Such data may render an appraisal more persuasive, but it does not distinguish a qualified appraisal from one that is unqualified.

The Tax Court cited Friedman v. Commissioner, 99 T.C.M. (CCH) 1175, 2010 WL 845949 (2010), for the proposition that "[w]ithout any reasoned analysis, the appraiser's report is useless."  Id. at *4 (internal quotation marks and alterations omitted).  In that case, however, the appraisal failed altogether to "even indicate the valuation method used or the basis for the appraised values."  Id.  The authority relied upon by Friedman is Jacobson v. Commissioner, 78 T.C.M. (CCH) 930, 1999 WL 1127811 (1999), which similarly concerned one appraisal that "provided no methodology or rationale for the values at which [the appraiser] arrived," and another appraisal that "did not contain any valuation methodology, any rationale for the prices quoted, or any reference to comparable sales."  Id. at *2.

The cited cases are therefore inapposite.  The Commissioner may deem Drazner's "reasoned analysis" unconvincing, but it is incontestably there.  Treasury Regulations do provide substantive requirements for what a

qualified appraisal must contain.[8]  Some would seem to be inapplicable, and others are expressly considered by Drazner.  And of course, the Treasury Department can use the broad regulatory authority granted to it by the Internal Revenue Code to set stricter requirements for a qualified appraisal.  Moreover, the Commissioner could review the Drazner appraisal in the context of a considerable body of data.  Around the time Scheidelman was audited, the IRS had undertaken a project in which it reviewed about 700 facade conservation easements, about one-third of them all.  See Internal Revenue Service Advisory Council 2009 General Report, available at http://www.irs.gov/taxpros/article/0,,id=215543,00.html.

In sum, the Drazner appraisal accomplishes the purpose of the reporting regulation: It provides the IRS with

---

[8] For example, the regulations require that, when before-and-after valuation is used, the appraisal must account for the effect of zoning and historic preservation laws as well as the possibility of other uses for the property.  See Treas. Reg. § 1.170A-14(h)(3)(ii).  Moreover, any increased value to other property owned by the donor must be offset against the decrease caused by the easement, id. § 1.170A-14(h)(3)(i), and account must be taken of any permissible uses of the subject property that will increase its value over its current use even if the restrictions reduce the fair market value of the property at its highest and best use, id. § 1.170A-14(h)(3)(ii).

sufficient information to evaluate the claimed deduction and "deal more effectively with the prevalent use of overvaluations."  Hewitt v. Comm'r, 109 T.C. 258, 265 (1997), aff'd, 166 F.3d 332 (4th Cir. 1998) (per curium).  And since the Commissioner's bottom line is that the donation had no value at all, it is hard to see how any defect in the appraisal would matter.

**D**

The Tax Court also found that the summary Form 8283 filed by Scheidelman failed to include the date and manner of acquisition of the property or its cost basis, see Treas. Reg. § 1.170A-13(c)(4)(ii)(D) & (E), and opined that those "defects alone demonstrate that there has not been strict compliance with the regulation['s] requirements."  Scheidelman, 2010 WL 2788205, at *7.  The Commissioner argues this point on appeal.  To the extent that the Tax Court's ruling rested on this observation, we reject it.

Scheidelman submitted two Form 8283s, which together contained the information required.  In support of her deduction, Scheidelman submitted the Form 8283 completed by Drazner and the Trust as well as a supplemental Form 8283 filled out (but not signed) by her tax preparer, John

Samoza.  The second Form 8283 contained the information omitted from the Form 8283 completed by the Trust and signed by Drazner and the Trust.

The second Form 8283 was not signed by Drazner or the Trust.  But the two forms were both attached to Scheidelman's tax return and together contained all of the information and signatures required by Treasury Regulations. The required information and signatures were thus dispersed in two forms submitted together, rather than gathered in a single form; but that is the most technical of deficiencies, which is properly excused on two grounds: "reasonable cause," see 26 U.S.C. § 170(f)(11)(A)(ii)(II); and the doctrine of substantial compliance, see Bond v. Comm'r, 100 T.C. 32, 42 (1993).

* * *

Drazner's delivery of a qualified appraisal does not itself entitle Scheidelman to a deduction.  In the Tax Court, the Commissioner argued that Scheidelman failed to comply with other statutory and regulatory requirements, including that the contribution be exclusively for conservation purposes (as required by 26 U.S.C. § 170(h)(1)(C)) and that it be protected into perpetuity (as

21

required by Treasury Regulation § 1.170A-14(g)(6)). Because the Tax Court has yet to decide these issues in the first instance, remand is appropriate.

If the Tax Court agrees with Scheidelman on these remaining issues, it would remain for the Tax Court to determine the value of the Scheidelman easement on the basis of the parties' submissions. Our conclusion that Drazner's appraisal meets the minimal requirements of a qualified appraisal mandates neither that the Tax Court find it persuasive nor that Scheidelman be entitled to any deduction for the donated easement.

**II**

The second issue on appeal is whether Scheidelman's $9,275 contribution to the Trust was "charitable," and therefore deductible under Section 170 of the Internal Revenue Code. Charitable gifts under the tax code are those "made with no expectation of a financial return commensurate with the amount of the gift." Hernandez v. Comm'r, 490 U.S. 680, 690 (1989) (internal quotation marks omitted). "The *sine qua non* of a charitable contribution is a transfer of money or property without adequate consideration." United States v. Am. Bar Endowment, 477 U.S. 105, 118 (1986). The

22

consideration need not be financial; medical, educational, scientific, religious, or other benefits can be consideration that vitiates charitable intent.  See Hernandez v. Comm'r, 819 F.2d 1212, 1217 (1st Cir. 1987), aff'd, 490 U.S. 680 (1989).

Congress and the Supreme Court have illustrated this principle using the example of donations made to a charitable hospital: a contribution is not deductible if given in exchange for a binding obligation to provide medical treatment.  See Hernandez, 490 U.S. at 690.  In this way, Section 170 distinguishes between "unrequited payments to qualified recipients and payments made to such recipients in return for goods or services."  Id.

Courts have implemented this *quid pro quo* principle by looking to "the external features of the transaction in question":

> If a transaction is structured in the form of a *quid pro quo*, where it is understood that the taxpayer's money will not pass to the charitable organization unless the taxpayer receives a specific benefit in return, and where the taxpayer cannot receive the benefit unless he pays the required price, then the transaction does not qualify for the deduction under section 170.

Graham, 822 F.2d at 849; see also Hernandez, 490 U.S. at 690-91 (approving "structural" analysis of transactions).

23

This structural approach obviates an inquiry into the donor's subjective intent.  Hernandez, 490 U.S. at 690-91.

While Scheidelman's $9,275 donation might be described as a *prerequisite* of the Trust's acceptance of the easement donation, the Trust gave the taxpayer no "goods or services," or "benefit," or anything of value in return for her making the money gift.  The only transfer of benefit was what the taxpayer gave to the Trust in the two gifts.[9] Earlier cases applying the *quid pro quo* principle concerned bargained-for exchanges for services desired by the taxpayer, such as religious or adoption services.  See Hernandez, 819 F.2d at 1217 (religious "auditing"); Murphy v. Comm'r, 54 T.C. 249, 253 (1970) (adoption fee).  But Scheidelman received no such benefit from the Trust in exchange for her cash donation.  A donee's agreement to accept a gift does not transfer anything of value to the donor, even though the donor may desire to have his gift accepted, and may expect to derive benefit elsewhere (such as by deductibility of the gift on her income taxes).

---

[9] The Commissioner suggests that Scheidelman received as consideration help in obtaining the necessary government and lender approval to convey the easement.  However, the logistical help was completed well before Scheidelman was obligated to pay the Trust at the time of the donation. Furthermore, the value in obtaining the necessary approvals was primarily a benefit to the Trust, without which the Trust would have been unable to secure its objectives.

Scheidelman's cash payment was part of her donation to the Trust. She gave the Trust the easement to hold, she endowed the maintenance of it, and the whole was an unrequited contribution. Contributions toward operating expenditures are commonplace among entities like the Trust that hold and administer facade contribution easements. The National Park Service has explained that

> Many easement holding organizations require the easement donor to make an additional donation of funds to help administer the easement. These funds are often held in an endowment that generates an annual income to pay for easement administration costs such as staff time and travel expenses, or needed legal services.

JA 232. Without some way of monitoring compliance, an easement of this kind is easily violated, withdrawn, or forgotten. When a cash contribution (even mandatory in nature) serves to fund the administration of another charitable donation, it is likewise an "unrequited gift." Scheidelman received nothing in return for her cash donation and facade conservation easement. It is true the taxpayer hoped to obtain a charitable deduction for her gifts, but this would not come from the recipient of the gift. It would not be a *quid pro quo*. If the motivation to receive a tax benefit deprived a gift of its charitable nature under Section 170, virtually no charitable gifts would be

25

deductible. See Mount Mercy Assocs. v. Comm'r, 67 T.C.M. (CCH) 2267, 1994 WL 53665, at *4 (1994).

Our conclusion is amply supported by Kaufman v. Commissioner, 136 T.C. 294 (2011), which rejected the argument advanced here by the Commissioner, and held that a mandatory cash contribution was deductible:

> Seeing no benefit to [the taxpayer] other than facilitation of her contribution of the facade easement . . . and an increased charitable contribution deduction, we shall not deny petitioners' deduction of the cash payments on the ground that the application required a "donor endowment" to accompany the contribution of facade easement.

Id. at 319. We agree, and hold that the contribution was deductible.

**III**

The Commissioner has cross appealed the Tax Court's decision not to impose a 20% accuracy-related penalty on Scheidelman for a "substantial understatement of income tax." See 26 U.S.C. § 6662(b)(2). Because we vacate the Tax Court's finding of understatement, we need not decide the issue.

## CONCLUSION

For the foregoing reasons, we vacate the decision of the Tax Court and remand the case for proceedings consistent with this opinion.