T.C. Memo. 2010-151

UNITED STATES TAX COURT

HUDA T. SCHEIDELMAN & ETHAN W. PERRY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15171-08.                    Filed July 14, 2010.

<u>Frank Agostino</u>, <u>Eduardo S. Chung</u>, and <u>Matthew Viera</u>, for
petitioners.

<u>John V. Cardone</u>, <u>Marc L. Caine</u>, and <u>Marie E. Small</u>, for
respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  By one statutory notice dated March 21, 2008,
respondent determined deficiencies of $16,873 and $17,537 with
respect to Huda T. Scheidelman's (petitioner's) Federal income
taxes for 2004 and 2005, respectively.  Respondent also

determined section 6662(a) penalties of $3,374.60 and $3,507.40 for 2004 and 2005, respectively.  By a second statutory notice of deficiency dated March 21, 2008, respondent determined a deficiency of $1,015 with respect to petitioners' Federal income tax for 2006 and a section 6662(a) penalty of $203.

The issues for decision are:  (1) Whether petitioners are entitled to charitable contribution deductions with respect to a historic facade easement donation; (2) whether a mandatory cash payment made to the donee organization is deductible as a charitable contribution; and (3) whether petitioners are liable for section 6662(a) penalties.  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioners resided in New York at the time that they filed their petition.  Petitioner is a registered nurse, has no tax experience, and has not been trained to value real estate.

On September 24, 1997, petitioner purchased a property on Vanderbilt Avenue within the Fort Greene Historic District in Brooklyn, New York, for $255,000 and became the fee simple owner. The Fort Greene Historic District is designated (1) a "registered historic district" within the meaning of section 47(c)(3)(B) by

the Secretary of the Interior through the National Park Service (NPS), a bureau within the U.S. Department of the Interior; and (2) a historic district by New York City and its Landmarks Preservation Commission. In New York City it is unlawful to alter, reconstruct, or demolish a building in a historic district without the prior consent of the Landmarks Preservation Commission. N.Y. City Admin. Code sec. 25-305 (2002).

Sometime in the fall of 2002, petitioner received a postcard from the National Architectural Trust (NAT), a section 501(c)(3) organization (that later became known as the Trust for Architectural Easements), announcing an upcoming meeting in the New York City area to provide information regarding the donation of a facade conservation easement, including possible related tax benefits. Petitioner was interested in preserving the historic facade of her house, particularly because she observed real estate development increasing in and around Fort Greene. She also wanted to obtain the tax benefits suggested by NAT.

Petitioner called NAT and inquired generally about the program. Petitioner also called John Somoza (Somoza), the accountant who had prepared her tax returns for approximately 10 years before 2004, and asked him about the program because of the noted tax implications of a donation. Somoza has a college degree, has practiced as an accountant for over 40 years, and has prepared thousands of tax returns during his career. Somoza

informed petitioner that he was not familiar with the donation of historic facade easements, but he offered to attend NAT's upcoming seminar.

At the seminar attended by Somoza, a representative from NAT presented information regarding facade easements and distributed an informational flier that Somoza forwarded to petitioner. Somoza conducted some additional research and informed petitioner that the facade easement contribution deduction did exist under the Internal Revenue Code. He also cautioned petitioner that encumbering the property might make it more difficult to sell in the future.

On March 24, 2003, petitioner completed a facade conservation easement application for the Vanderbilt property to be considered for a facade conservation easement donation to NAT. On the application, petitioner identified two lenders that held mortgages on the property. NAT required a deposit of $1,000 to be submitted with the application, which was fully refundable if the necessary approvals for the facade easement donation could not be obtained. The application stated that NAT's "operating funds come solely from cash donations made by persons donating an easement. An agreed upon cash donation of 10% of the easement value is required at the time the easement donation is accepted by [NAT]".

In a letter dated April 2, 2003, the NAT Director of Operations informed petitioner that her application had been accepted and that processing would commence. The letter informed petitioner that NAT:

> will place significant effort to the processing of your application. Processing an application is complex and time consuming. It involves obtaining approvals from the State and Federal Governments, and your lender.
> * * *
>
> There is nothing required of you until all approvals are received.

NAT sought the approval of petitioner's mortgage holders regarding the placement of a preservation restriction agreement on her Vanderbilt property. The two mortgage holders executed lender agreements that were submitted to NAT during the approval process.

On May 12, 2003, to comply with another component of the approval process, petitioner executed a National Park Service Form 10-168, Historic Preservation Certification Application Part 1 – Evaluation of Significance, to request that the NPS certify the historic significance of the Vanderbilt property. The NPS determined that petitioner's Vanderbilt property contributes to the significance of the Fort Greene Historic District and is a "certified historic structure" for a charitable contribution for conservation purposes in accordance with the Tax Treatment Extension Act of 1980.

Later in 2003, petitioner informed NAT that she had decided not to pursue the donation until 2004. Petitioner needed time to save the additional required cash due, as outlined in the application. By letter dated April 22, 2004, NAT informed petitioner that all of the necessary approvals had been received and that she needed to order an appraisal. NAT provided in the letter a list of appraisers "qualified to do easement appraisals". Petitioner hired one of the listed appraisers, Michael Drazner (Drazner), formerly of Mitchell, Maxwell & Jackson, Inc., to perform an appraisal of the Vanderbilt property.

Drazner and James Kearns (Kearns), president of NAT, first communicated in December 2001 when Kearns contacted Drazner to inquire whether he would be able to prepare appraisals for homeowners who were interested in donating facade easements to NAT. Kearns sent copies of reports to Drazner that had been prepared by another appraisal firm outside of the New York City area along with some information regarding court cases that involved the charitable contribution of facade easements.

Drazner completed an appraisal (the Drazner report) for the subject property on May 20, 2004. The report states that the appraisal was completed in accordance with title XI of the Federal Financial Institutions Reform, Recovery, and Enforcement Act of 1989 and the Uniform Standards of Professional Appraisal

Practice.  Drazner is a qualified expert in the field of real estate appraisal and valuation.

Petitioner's Vanderbilt property was described in the Drazner report as:

> an attached four story, three family townhouse located in the Boerum Hill neighborhood of Kings County.  The subject is physically and functionally adequate 'as is' * * * [and] features a rear deck, patio, and clean tiled subcellar below the garden level.  This home also includes a wealth of turn of the century details that generate strong demand for such homes in the area. These include wood mouldings, paneling and wainscotting, volume ceilings, exposed brick walls, stained glass windows, original wood planking, and fireplaces.

Drazner determined that the estimated market value of the property was $1,015,000 as of the appraisal date.  The Drazner report outlined the use of the three classic approaches to value (sales comparison, cost, and income) that were considered to determine the market value of the Vanderbilt property.  The report stated that the sales comparison approach is the "most applicable and has been given greatest weight in the determination of the final value * * * [and] the cost approach was given least weight due to the age of the subject property." The stated purpose of the report was "to estimate 'as is' value of the subject property and to estimate the impact on the subject property if granted an 'architectural facade easement.'"  The report explained that

> An easement is a particularly useful historic preservation tool in several respects.  First, it

allows an individual to retain private ownership of the property and obtain potential financial benefits. Second, an easement binds not only the current owner, but all future owners as well, ensuring that the property will be maintained and observed by future owners. Third, easements are tailored to meet the needs of the property owner, the individual resource, and the mission of the protecting organization. * * *

If certain criteria are met, the owner also may receive a Federal income tax deduction equivalent to the value of the rights given away to a charitable, or governmental organization. * * * The deduction the taxpayer is entitled to is equal to the fair market value of the easement, which is generally the decrease in fair market value of the property caused by the restrictions placed on the property because of the easement.

The Drazner report briefly discussed two cases involving easement valuation, Hilborn v. Commissioner, 85 T.C. 677 (1985), and Richmond v. United States, 699 F. Supp. 578 (E.D. La. 1988), and stated that

As these cases depict, it is extremely difficult for appraisers to estimate the probable and possible impact on a property's value by the imposition of a facade conservation easement that is granted in perpetuity. For most attached row properties in New York City, where there are many municipal regulations restricting changes to properties located in historic districts, the facade easement value tends to be about 11 - 11.5% of the total value of the property. That figure is based on the appraiser's experience as to what the Internal Revenue Service has found acceptable (on prior appraisals).

The Drazner report further stated that

This facade easement can, and often does, have an effect on marketability and the market value of a property. The measurement of this effect or impact is difficult to quantify with any supported precision. Articles, periodicals, and books have been written on the subject (measurement of the value of the historic

easement).  However, in this market area, there is no measure or formula that is applicable for all properties.  The individual properties are so unique that each case must be evaluated on its own. Additionally, while there are accepted methods for measuring this effect, only the market can provide the true test.  Nonetheless, there are market measures that provide sufficient data with which to bracket and support a reasonable market indicator.

Estimating the value of a property after the donation of a conservation easement is very much like condemnation appraisal practice where easements or partial fee interests are taken from property owners by a sovereign.  Attempts must be made to define what rights have been lost by the property owners and what elements of damage (or enhancement) are involved in the loss.  Because real estate is not bought and sold in a vacuum, the appraiser has endeavored to place himself in the mindset of competent buyers and sellers and to examine considerations they have actually had, or are likely to have, in the buying or selling of a property encumbered by a facade easement.

    *       *       *       *       *       *       *

It is now generally recognized by the Internal Revenue Service that the donation of a facade easement of a property results in a loss of value * * * between 10% and 15%.  The donation of a commercial property results in a loss of value of between 10% or 12% or higher if development rights are lost.  The inclusive data support at least these ranges, depending on how extensive the facade area is in relation to the land parcel.

It is our opinion that the presence of the facade conservation easement would alter the market value of the subject property.  In the subject's market area, the appraiser cannot precisely estimate the extent to which this "loss in value" will result from the facade easement due to the lack of market data.  In this situation it is the appraiser's conclusion that the value of the facade conservation easement * * * on the subject property would be estimated at $115,000, which is approximately 11.33% of the fee simple value of $1,015,000.  This conclusion is based on consideration of range of value that the I.R.S. has historically

found to be acceptable as well as historical precedents. Therefore, the presence of the historic facade easement would decrease the fair market value of the property rights held by the homeowner of the subject property to $900,000.

An article entitled "Facade Easement Contributions" was prepared by Mark Primoli of the Internal Revenue Service (IRS) sometime before 2002 and was included as a part of the IRS' 1994 Market Segment Specialization Program Audit Technique Guide on the Rehabilitation Tax Credit--used to assist in training IRS personnel. The article stated that

> Internal Revenue Service Engineers have concluded that the proper valuation of a facade easement should range from approximately 10% to 15% of the value of the property. Once fair market values have been determined, the same ratios are used to allocate the basis of the building and the underlying land to the facade easement for both rehabilitation tax credit and depreciation purposes. See Treasury Regulation 1.170A-14(h).

An excerpt from this article was posted on the NPS' Web site until early 2003 but was revised in 2003 to remove the first sentence quoted above. The Drazner report does not cite this article.

By letter dated June 7, 2004, NAT informed petitioner that it was in receipt of the Drazner report valuing the Vanderbilt property facade easement at $115,000. In the letter, NAT also informed petitioner that if she closed on the facade easement contribution transaction by June 30, 2004, the cash payment due would be $9,275 (applying a 15-percent discount to 10 percent of

the easement value and deducting a processing fee of $500 that one of the lenders charged from the initial $1,000 deposit).

Petitioner sent a check for $9,275 to NAT dated June 18, 2004, and NAT confirmed receipt of the moneys by letter dated July 2, 2004. The letter also stated that NAT "certifies that you have received no goods or services in return for your gifts", and informed petitioner that attached was a Form 8283, Noncash Charitable Contributions, executed by the appraiser and NAT.

On June 23, 2004, Kearns signed the conservation deed on behalf of NAT. On September 21, 2004, the City of New York recorded the conservation deed of easement for the Vanderbilt property. The deed of easement for the subject property is considered to be only an architectural facade conservation easement.

Petitioner attached Form 8283 to her 2004 Form 1040, U.S. Individual Income Tax Return, and reported a $115,000 gift to charity on line 16 of Schedule A, Itemized Deductions. The Form 8283 filed had two versions of page 2, with one signed by the appraiser and president of NAT and the other lacking these signatures. Both reported essentially the same information: (1) A description of the donated property as a facade easement with respect to the Vanderbilt property; (2) the overall physical condition being a "Historic Preservation Easement Donation"; and (3) a stated appraised fair market value of $115,000 for the

donated property.  On the executed page 2, Drazner signed the declaration of appraiser section and identified the appraisal date as May 20, 2004, and Kearns, as president of NAT, signed an acknowledgement of receipt of the contribution by NAT, as donee, on June 23, 2004.

On her 2004 tax return, petitioner did not claim a deduction for the full $115,000 because of limitations provided under section 170(b).  Petitioner carried over $63,083 of the reported contribution to her 2005 tax return and claimed a deduction of $59,959 according to section 170(d)(1).  The remaining $3,124 was carried over and claimed as a deduction on petitioners' jointly filed 2006 tax return.  No charitable contribution deduction for the cash payment to NAT was claimed on the tax return filed for 2004, 2005, or 2006.

Somoza prepared petitioner's tax returns for 2004 and 2005 and petitioners' joint tax return for 2006 using information supplied by petitioners.

In the notice of deficiency sent to petitioner for 2004 and 2005, petitioner's deduction for a charitable contribution of property was not allowed because:

> The contribution of property to a qualifying
> organization is measured by the fair market value of
> that property at the time the gift is made.  Based upon
> all available information, you have not established the
> fair market value.  Therefore, we have disallowed your
> charitable contribution deduction of property in full.

The carryovers claimed for 2005 and 2006 were accordingly disallowed.

OPINION

Section 170(a)(1) allows as a deduction any charitable contribution verified under regulations prescribed by the Secretary.  Generally, an individual claiming a noncash charitable contribution of more than $5,000 is required to: (1) Obtain a qualified appraisal of such property, (2) attach a fully completed appraisal summary (i.e., Form 8283) to the tax return on which the deduction is claimed, and (3) maintain records pertaining to the claimed deduction in accordance with section 1.170A-13(b)(2)(ii), Income Tax Regs.  Sec. 1.170A-13(c)(2), Income Tax Regs.

Section 170(f)(11), added as part of the American Jobs Creation Act of 2004, Pub. L. 108-357, sec. 883, 118 Stat. 1631, is effective for contributions made after June 3, 2004.  Section 170(f)(11)(E) provides that the term "qualified appraisal" means an appraisal that is treated as a qualified appraisal under regulations or other guidance prescribed by the Secretary.  Section 170(f)(11)(H) gives the Secretary authority to prescribe regulations to carry out the purposes of this section.  For appraisals prepared with respect to returns filed on or before August 17, 2006, the requirements under section 1.170A-13(c),

Income Tax Regs., related to a qualified appraisal and qualified appraiser, apply.  See Notice 2006-96, 2006-2 C.B. 902.

The regulations state, among other things, that a qualified appraisal is made not earlier than 60 days before the date of contribution of the appraised property nor later than the due date of the tax return on which a deduction is first claimed; is prepared, signed, and dated by a qualified appraiser; and includes the following information:

(A) A description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed;

(B) In the case of tangible property, the physical condition of the property;

(C) The date (or expected date) of contribution to the donee;

(D) The terms of any agreement or understanding entered into (or expected to be entered into) by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed, * * *

(E) The name, address, and * * * identifying number of the qualified appraiser; * * *

(F) The qualifications of the qualified appraiser who signs the appraisal, including the appraiser's background, experience, education, and membership, if any, in professional appraisal associations;

(G) A statement that the appraisal was prepared for income tax purposes;

(H) The date (or dates) on which the property was appraised;

(I) The appraised fair market value (within the meaning of §1.170A-1(c)(2)), of the property on the date (or expected date) of contribution;

(J) The method of valuation used to determine the fair market value, such as the income approach, the market-data approach, and the replacement-cost-less-depreciation approach; and

(K) The specific basis for the valuation, such as specific comparable sales transactions or statistical sampling, including a justification for using sampling and an explanation of the sampling procedure employed.

Sec. 1.170A-13(c)(3)(ii), Income Tax Regs.

The appraisal summary must include, among other things, a description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property appraised is the property that was contributed, a brief summary of the property's physical condition, the manner and date of acquisition, and the cost or other basis of the property. See sec. 1.170A-13(c)(4)(ii), Income Tax Regs.

Respondent argues that the Form 8283 attached to petitioner's 2004 tax return did not satisfy the requirements outlined in section 1.170A-13(c)(4), Income Tax Regs. Petitioners assert that the Form 8283 included all the required information.

The Form 8283 attached to petitioner's 2004 tax return did not include the date and manner of acquisition of the property purportedly contributed or the cost or other basis of the property purportedly contributed, adjusted as provided by section

1016.  These defects alone demonstrate that there has not been strict compliance with the regulation requirements.

Respondent contends further that petitioners did not satisfy the requirements of section 1.170A-13(c), Income Tax Regs., regarding obtaining a qualified appraisal because the Drazner report did not describe the property contributed; did not include the terms of the deed of easement; did not include a statement that it was prepared for income tax purposes; and did not provide the method and specific basis for valuing the easement. Petitioners assert that these requirements were satisfied.

The evidence at trial, notably conflicting expert testimony, and the arguments of the parties, deal in large part with valuation of the facade easement by traditional fair market analysis.  Because we conclude that the Drazner report is not a qualified appraisal, we do not discuss this evidence or reach a conclusion as to the value of the easement.

Section 1.170A-13(c)(3)(ii)(J), Income Tax Regs., provides that the qualified appraisal is to include the method of valuation used to determine the fair market value, such as the income approach, the market-data approach, and the replacement-cost-less-depreciation approach.  These methods are suggested, but not mandatory.  Further, other valuation methods were contemplated in the legislative history of the Act of Dec. 17, 1980, Pub. L. 96-541, 94 Stat. 3204, regarding the deduction for

charitable contributions of real property for conservation

purposes under section 170:

> In general, a deduction is allowed for a charitable contribution in the amount of the fair market value of the contributed property, defined as the price at which the property would change hands between a willing buyer and a willing seller.  Thus, the amount of the deduction for the contribution of a conservation easement or other restriction is the fair market value of the interest conveyed to the recipient. However, because markets generally are not well established for easements or similar restrictions, the willing buyer/willing seller test may be difficult to apply * * *.  As a consequence, conservation easements are typically (but not necessarily) valued indirectly as the difference between the fair market value of the property involved before and after the grant of the easement.  (See Rev. Rul. 73-339, 1973-2 C.B. 68 and Rev. Rul. 76-376, 1976-2 C.B. 53).  Where this test is used, however, the committee believes it should not be applied mechanically.  [S. Rept. 96-1007, at 14-15 (1980), 1980-2 C.B. 599, at 606.]

As the Drazner report states, and we have previously noted,

comparable sales transactions involving real estate with similar

facade easements are not always available.  See Hilborn v.

Commissioner, 85 T.C. at 688; Simmons v. Commissioner, T.C. Memo.

2009-208.  The "before and after" approach has been used on

numerous occasions to determine the fair market values of

restrictive easements with respect to which charitable

contribution deductions are claimed.  See, e.g., Hilborn v.

Commissioner, supra; Simmons v. Commissioner, supra; Griffin v.

Commissioner, T.C. Memo. 1989-130, affd. 911 F.2d 1124 (5th Cir.

1990).

As we outlined in <u>Hilborn v. Commissioner</u>, <u>supra</u> at 689-690:

> "Before" value (before value) is arrived at by first determining the highest and best use of the property in its current condition unrestricted by the easement.  At this stage, the suitability of the property's current use under existing zoning and market conditions and realistic alternative uses are examined.  Any suggested use higher than current use requires both "closeness in time" and "reasonable probability."  Next, to the extent possible, the three commonly recognized methods of valuing property (capitalized net operating income, replacement cost, and comparable sales) are used, but are modified to take into account any peculiarities of the property which impact on the relative weight to be afforded each respective method.

> "After" value (after value) is arrived at by first determining the highest and best use of the property as encumbered by the easement.  At this stage the easement's terms and covenants are examined, individually and collectively, and compared to existing zoning regulations and other controls (such as local historic preservation ordinances) to estimate whether, and the extent to which, the easement will affect current and alternate future uses of the property.  Next, the above-mentioned three approaches to valuing property are again utilized to estimate the value of the property as encumbered by the easement.

The Drazner report purportedly employed the before and after method.  To determine the "before" market value of the Vanderbilt property, Drazner considered the three approaches to value (sales comparison, cost, and income).  Drazner's determination of the "after" value stated that it was "based on consideration of a range of value that the I.R.S. has historically found to be acceptable as well as historical precedents."  Petitioners contend that this satisfies the requirements of section 1.170A-13(c)(3)(ii)(J) and (K), Income Tax Regs., by identifying:

(a) the method of valuation used to determine the fair market value (i.e., the appraiser's comparison of the Primoli Memorandum's accepted range of values as narrowed down according to the appraiser's judgment); and (b) the specific basis for the valuation (i.e., the lack of market data, IRS publications and case law).

We have previously held that such information as the valuation method used or the basis for the appraised value is essential because "'Without any reasoned analysis, * * * [the appraiser's] report is useless.'" Friedman v. Commissioner, T.C. Memo. 2010-45 (quoting Jacobson v. Commissioner, T.C. Memo. 1999-401). In Nicoladis v. Commissioner, T.C. Memo. 1988-163, we found that the facade easement did result in a 10-percent decrease in value under the facts and circumstances of the case, but further stated that

we do not mean to imply that a general "10-percent rule" has been established with respect to facade donations. There was a fair amount of discussion by the parties at trial about whether the Court had established a "10-percent rule" in Hilborn. We did not there and do not here. Hilborn establishes as acceptable the before and after method of valuation, and while under the circumstances of that case a 10-percent figure was relied upon, valuation itself is still a question of facts and circumstances. * * *

There have been additional cases in which percentage reductions have been accepted to determine an easement's value based on qualitative factors that suggest such a value. See, e.g., Griffin v. Commissioner, supra; Losch v. Commissioner, T.C. Memo. 1988-230. However, Drazner's report failed to outline and analyze qualitative factors for the Vanderbilt property.

Petitioners argue that the Drazner report outlined the methodology set forth to determine the "after" fair market value and assert that Drazner explained at trial that his appraisal was "not mechanical, it was reasoned." However, the application of a percentage to the fair market value before conveyance of the facade easement, without explanation, cannot constitute a method of valuation as contemplated under section 1.170A-13(c)(3)(ii), Income Tax Regs. Drazner's report applied mechanically a percentage with no demonstrated support as to its derivation, other than acceptance of similar percentages in prior controversies. Further, no meaningful analysis was provided in the Drazner report to explain why Drazner applied 11.33 percent to the before fair market value of the property to calculate the facade easement value other than his statement:

> For most attached row properties in New York City, where there are many municipal regulations restricting changes to properties located in historic districts, the facade easement value tends to be about 11 - 11.5% of the total value of the property. That figure is based on the appraiser's experience as to what the Internal Revenue Service has found acceptable (on prior appraisals).

This assertion fails to explain how the specific attributes of the subject property led to the value determined in the Drazner report.

The Drazner report indicated that estimating the value of a property after the donation of a facade conservation easement is much like condemnation appraisal practice that includes attempts

to define what rights have been lost by the property owners and what elements of damage (or enhancement) are involved in the loss. Such an analysis was not included in the Drazner report for the Vanderbilt property.

At trial, when asked by respondent's counsel to explain how he determined the after value of the property and how he measured the effect of the facade easement on the property, Drazner testified:

> A:  Based on prior legal cases in summaries that the facade easement donations were between 10 and 15 percent.  So, I applied the fee simple value and I multiplied them by a factor of 11 percent to arrive at the effect of the easement donation as to that would be the deduction of the fee simple value, the deduction from the before value.
>
> Q:  Did you round the value at all after you applied 11 percent, round the value of the effect of the easement?
>
> A:  I usually did.
>
> Q:  What was the number approximately that you did round?
>
> A:  I would say the closest $5,000.
>
> Q:  Now, did you use this process for any other easements * * * ?
>
> A:  Yes, I did.
>
> *        *        *        *        *        *        *
>
> Q:  Did your methodology or process change in any way?
>
> A:  In some cases I would use a different percentage factor.

Q:   What was that based on?

A:   Whether the property * * *  [was] attached, semi-attached, or detached on all sides.

Q:   Did you base it on anything else?

A:   No.  In general I based it on between the 10 and 15 percent standard, and within that range I would use a lower number if the property * * * [was] attached on both sides, as in the case of * * * [petitioner's] property.  In other cases if the property were detached, I would use a slightly higher percentage.

Petitioners' counsel questioned Drazner about the number of sales of easement-encumbered properties that he was aware of at the time he conducted the appraisal for petitioner, with Drazner testifying that

A:   I believe that I only knew of one.

Q:   The one that you knew of, was that on Willow Street?

A:   Yes, it was.

Q:   Did you personally appraise that property?

A:   I believe that I appraised it for the easement donation purpose.

Q:   How did you come to the conclusion that your appraisal was correct?

A:   Which appraisal are you referring to?

Q:   The subsequent sale of the property was less than.

A:   I had done many appraisals in that neighborhood, and based on sales of properties similar to that property on Willow Street in records to lot size and the building square footage, their property sold for a lower price than I believe it would have sold without the easement encumbrance.

No further information regarding the details or specifications of the Willow Street property was supplied, and it was not a part of the Drazner report. Drazner testified that he had performed many appraisals in the neighborhood of the Willow Street property, and on the basis of sales of similar properties in the area, he was able to determine that the property sold for a lower price than the property's market value without the easement encumbrance. Drazner stated that he believed this sale confirmed that an easement encumbrance reduces the fair market value of a property. Further information regarding the Willow Street property, such as the fair market value assumed by Drazner at the time of the sale, had it been sold without the encumbering easement, compared to the actual sale price; terms of the easement; and whether the property is within a recognizable historic district would be necessary to assess the reliability of the Drazner analysis.

Petitioners rely on a quotation from Simmons v. Commissioner, T.C. Memo. 2009-208, that "appraisals also include discussions of IRS practice and cases of this Court concerning facade easements", to assert that the Drazner methodology is sufficient to satisfy the qualified appraisal reporting requirements. However, in Simmons, the appraisals included statistics gathered by the donee organizations that the appraiser took into account; and each appraisal identified the method of

valuation used and the basis for the valuations reached. The Drazner report used only estimates based on prior cases and displayed no independent or reliable methodology applied to the subject property as the basis for the valuation reached. Thus, we conclude that petitioners have failed to comply with the substantiation requirements under section 170(f) and section 1.170A-13, Income Tax Regs.

Petitioners argue that their compliance with the substantiation requirements should be excused on the ground of reasonable cause. Section 170(f)(11)(A)(ii)(II) provides that the requirement to obtain a qualified appraisal under section 170(f)(11)(C) will not apply if it is shown that the failure to meet the requirement is due to reasonable cause and not due to willful neglect.

Petitioner obtained an appraisal that we have concluded is not a qualified appraisal under section 170(f)(11). Although the regulations do not require that a specific method of valuation be used to determine the fair market value for noncash contributions of more than $5,000, the appraisal must still include the method of valuation used and the specific basis for the valuation. See sec. 1.170A-13(c)(3)(ii)(J) and (K), Income Tax Regs. Petitioners have not persuaded us that reasonable cause existed and excuses the failure to comply with the requirements for obtaining a qualified appraisal.

Petitioners next assert that they are entitled to a deduction for the charitable contribution of the facade easement because they substantially complied with the regulations.

Under the substantial compliance doctrine, the critical question is whether the requirements relate "'to the substance or essence of the statute.'" Bond v. Commissioner, 100 T.C. 32, 40-41 (1993) (quoting Sperapani v. Commissioner, 42 T.C. 308, 331 (1964)).  If so, strict adherence to all statutory and regulatory requirements is mandatory.  See Dunavant v. Commissioner, 63 T.C. 316, 319-320 (1974).  However, if the requirements are procedural or directory in that they are not of the essence of the things to be done but are given with a view to the orderly conduct of business, then they may be fulfilled by substantial compliance. See id.  We have previously held that the reporting requirements of section 1.170A-13, Income Tax Regs., are directory and require only substantial compliance.  Bond v. Commissioner, supra at 41-42.

In Bond, the taxpayers donated two blimps to a charitable organization and obtained a professional appraisal of the blimps in that same month.  The appraiser completed an appraisal summary for inclusion with the taxpayers' tax return but did not provide a separate written report of the appraisal.  The appraisal summary contained most of the information required for a qualified appraisal, and the taxpayers promptly furnished the IRS

with a letter outlining the appraiser's qualifications and the appraisal methodology used shortly after the audit of their tax return commenced.  Id. at 34-35.

In Simmons v. Commissioner, supra, we found that the taxpayer had substantially complied with the substantiation requirements of section 170 because she "included all of the required information in the appraisals attached to her returns or on the face of the returns."

Petitioners claim they substantially complied with the substantiation requirements of section 170 because, as in Bond and Simmons, the documents that they submitted included the information required for a qualified appraisal and appraisal summary.  We disagree.  In this case the lack of a recognized methodology or specific basis for the calculated after-donation value is too significant for us to ignore under the guise of substantial compliance.

When a qualified appraisal has not been submitted, we have not applied the doctrine of substantial compliance to excuse a taxpayer's failure to meet the qualified appraisal requirement. See, e.g., Hewitt v. Commissioner, 109 T.C. 258, 264-266 (1997), affd. without published opinion 166 F.3d 332 (4th Cir. 1998); D'Arcangelo v. Commissioner, T.C. Memo. 1994-572.  We cannot accept the Drazner report as a qualified appraisal complying with the substantiation requirements of section 170.

We conclude that petitioners did not substantially comply with section 1.170A-13(c), Income Tax Regs. Accordingly, petitioners are not entitled to the claimed noncash charitable contribution deduction.

Respondent argues in the alternative that petitioner's contribution of the easement failed to meet the section 170(h) requirements for a qualified conservation contribution because it was not exclusively for conservation purposes and is not protected in perpetuity according to section 1.170A-14(g)(6), Income Tax Regs. See, e.g., Kaufman v. Commissioner, 134 T.C. ___ (2010). We do not reach the contentions that the easement does meet the requirements of section 170(h) because we conclude that petitioners did not satisfy the requirement of obtaining a qualified appraisal.

Deductibility of Cash Payment

Petitioner did not claim a charitable contribution deduction on her 2004 tax return for the $9,275 check dated June 18, 2004, paid to NAT. Petitioners noted this in their pretrial memorandum and raised the deductibility of this payment at trial. Respondent initially objected to trying this issue, but subsequently conceded that this issue was tried by consent.

Respondent asserts that petitioner's cash payment to NAT was not a "contribution or gift" under section 170(a) and that the payment was made as a quid pro quo because NAT accepted the

facade easement and assisted petitioner in claiming a tax deduction in return for petitioner's cash payment, calculated as a percentage of petitioner's valuation of the facade easement.

A payment of cash to a qualified organization may be deductible under section 170 if the payment is a "contribution or gift". A payment of money or transfer of property generally cannot constitute a charitable contribution if the contributor expects a substantial benefit in return. See United States v. Am. Bar Endowment, 477 U.S. 105, 116 (1986).

> If a transaction is structured in the form of a quid pro quo, where it is understood that the taxpayer's money will not pass to the charitable organization unless the taxpayer receives a specific benefit in return, and where the taxpayer cannot receive the benefit unless he pays the required price, then the transaction does not qualify for the deduction under section 170.

Graham v. Commissioner, 822 F.2d 844, 849 (9th Cir. 1987), affd. sub nom. Hernandez v. Commissioner, 490 U.S. 680 (1989).

A taxpayer who receives or expects to receive a benefit in return for a purported contribution may nonetheless be allowed a deduction if the money or property transferred clearly exceeds the benefit received and the excess is given with the intent to make a gift. See United States v. Am. Bar Endowment, supra at 117. A taxpayer claiming a charitable contribution deduction under this "dual character" theory, however, "must at a minimum demonstrate that * * * [she] purposely contributed money or

property in excess of the value of any benefit * * * [she] received in return." Id. at 117-118.

Petitioners failed to provide evidence necessary for us to determine that in return for the payment of cash to NAT they received nothing of substantial value or, if they did receive something of substantial value, that they are entitled to a partial charitable contribution deduction because the payment exceeded the value of the benefits received. Accordingly, we hold that petitioners have not sustained their burden of proving that they are entitled to deduct any portion of the amount paid to NAT as a charitable contribution under section 170.

## Section 6662 Accuracy-Related Penalty

Petitioners contest the imposition of an accuracy-related penalty under section 6662(a). Section 6662(a) and (b)(1) and (2) imposes a 20-percent accuracy-related penalty on any underpayment of Federal income tax attributable to a taxpayer's negligence or disregard of rules or regulations, or a substantial understatement of income tax. Section 6662(d)(1)(A) defines "substantial understatement of income tax" as an amount exceeding the greater of 10 percent of the tax required to be shown on the return or $5,000.

Under section 7491(c), the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is proper to impose

penalties.  Higbee v. Commissioner, 116 T.C. 438, 446 (2001).
However, once the Commissioner has met the burden of production,
the burden of proof remains with the taxpayer, including the
burden of proving that the penalties are inappropriate because of
reasonable cause or substantial authority.  Id. at 446-447.

Respondent asserts that substantial understatements of
income tax exist for 2004 and 2005.  Each of the deficiencies,
after disallowance of the charitable contribution deductions
attributable to the easements, is greater than $5,000 and greater
than 10 percent of the amount of tax required to be shown on the
return.  Respondent's burden of production has been met for 2004
and 2005.

The accuracy-related penalty under section 6662(a) is not
imposed with respect to any portion of the underpayment as to
which the taxpayer acted with reasonable cause and in good faith.
Sec. 6664(c)(1).  The decision as to whether a taxpayer acted
with reasonable cause and in good faith is made on a case-by-case
basis, taking into account all of the pertinent facts and
circumstances, including the taxpayer's experience, knowledge,
and education.  Sec. 1.6664-4(b)(1), Income Tax Regs.
"Generally, the most important factor is the extent of the
taxpayer's effort to assess the taxpayer's proper tax liability."
Id.  Reliance on professional advice may constitute reasonable
cause and good faith, but only if, under all the circumstances,

such reliance was reasonable.  Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991); sec. 1.6664-4(b)(1), Income Tax Regs. Reasonable cause exists where a taxpayer relies in good faith on the advice of a qualified tax adviser where the following three elements are present:  "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment."  Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002).

Petitioner credibly testified that she was not a tax expert and hired Somoza to ensure that her tax returns were properly filed.  Somoza was a competent tax professional, though not knowledgeable about facade easement donations.  As petitioner's return preparer of many years, he was involved with petitioner's facade easement contribution from the beginning and had access to all the information needed to properly evaluate the tax treatment of the facade conservation easement.  Somoza relied in turn on Drazner, whom the parties agree is a qualified appraiser for purposes of section 170, regarding the value of the noncash charitable contribution.

We conclude that petitioner had reasonable cause and acted in good faith as to any underpayment for 2004 and therefore is not liable for the penalty for that year.  The 2005 and 2006 underpayments resulted from carryovers from 2004, so the penalties for those years also will not be sustained.

We have considered the other arguments of the parties but do not reach them because of our conclusion on a decisive issue. To reflect the foregoing,

<u>Decision will be entered for respondent as to the deficiencies and for petitioners as to the penalties</u>.