T.C. Memo. 2013-18

UNITED STATES TAX COURT

HUDA T. SCHEIDELMAN AND ETHAN W. PERRY, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent<sup>*</sup>

Docket No. 15171-08.                     Filed January 16, 2013.

<u>Frank Agostino</u>, <u>Eduardo S. Chung</u>, and <u>Matthew Viera</u>, for petitioners.

<u>John V. Cardone</u>, <u>Marc L. Caine</u>, and <u>Marie E. Small</u>, for respondent.

SUPPLEMENTAL MEMORANDUM OPINION

COHEN, <u>Judge</u>:  This case is before us on remand from the U.S. Court of

Appeals for the Second Circuit, <u>Scheidelman v. Commissioner</u>, 682 F.3d 189 (2d

---

<sup>*</sup>This opinion supplements our previously filed opinion, <u>Scheidelman v. Commissioner</u>, T.C. Memo. 2010-151, <u>vacated and remanded</u>, 682 F.3d 189 (2d Cir. 2012).

[*2] Cir. 2012), vacating and remanding T.C. Memo. 2010-151. The Court of Appeals vacated our decision, entered in accordance with our conclusions in Scheidelman, that petitioners were not entitled to noncash or cash charitable contribution deductions relating to the grant of a historic facade easement and a cash contribution to the National Architectural Trust (NAT). The Court of Appeals held that the appraisal petitioners relied on at the time their 2004 tax return was filed (Drazner report) was a "qualified appraisal" for purposes of section 170(f)(11) and that the disputed cash contribution was deductible.

The case was remanded for a determination of the fair market value of the easement if we do not accept respondent's other statutory and regulatory arguments, which relied on section 170(h)(5)(A) (a contribution shall not be treated as exclusively for conservation purposes unless the conservation purpose is protected in perpetuity) and section 1.170A-14(g), Income Tax Regs. (requirements which must be met for the perpetuity requirement to be satisfied). See Kaufman v. Commissioner, 136 T.C. 294 (2011), aff'd in part, vacated in part and remanded in part, 687 F.3d 21 (1st Cir. 2012). Respondent no longer contends that the conservation deed and the annexed lender agreement failed the requirements of section 1.170A-14(g)(6), Income Tax Regs., that the contribution be protected in perpetuity.

**[\*3]**   The appeal also involved respondent's challenge to our decision not to sustain section 6662(a) penalties against petitioners.  Vacation of our decision mooted that portion of the appeal.  If we had been correct that the Drazner appraisal was not a qualified appraisal under the statute, the case for penalties would have been stronger than it is now.  See Evans v. Commissioner, T.C. Memo. 2010-207, slip op. at 29.  We see no reason to reconsider our prior conclusion with respect to the penalties, and do not do so here.

The parties have agreed that this case may be decided on remand on the evidence and arguments already in the record.  Unless otherwise indicated, all section references are to the Internal Revenue Code for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

### Background

For convenience, we repeat here portions of the findings of fact in our prior Memorandum Opinion describing the relevant history of petitioner Huda T. Scheidelman's donation of a historic facade easement and the Drazner appraisal obtained in relation to that donation.

On September 24, 1997, Huda T. Scheidelman (petitioner) purchased a property on Vanderbilt Avenue within the Fort Greene Historic District in Brooklyn, New York, for $255,000 and became the fee simple owner.  The Fort

**[*4]** Greene Historic District is designated (1) a "registered historic district" within the meaning of section 47(c)(3)(B) by the Secretary of the Interior through the National Park Service (NPS), a bureau within the U.S. Department of the Interior; and (2) a historic district by New York City and its Landmarks Preservation Commission (LPC).  In New York City it is unlawful to alter, reconstruct, or demolish a building in a historic district without the prior consent of the LPC.  N.Y. City Admin. Code sec. 25-305 (2002).

Sometime in the fall of 2002, petitioner received a postcard from the National Architectural Trust (NAT), a section 501(c)(3) organization (that later became known as the Trust for Architectural Easements), announcing an upcoming meeting in the New York City area to provide information regarding the donation of a facade conservation easement, including possible related tax benefits.  Petitioner was interested in preserving the historic facade of her house, particularly because she observed real estate development increasing in and around Fort Greene.  She also wanted to obtain the tax benefits suggested by NAT.

On March 24, 2003, petitioner completed a facade conservation easement application for the Vanderbilt property to be considered for a facade conservation easement donation to NAT.  On the application, petitioner identified two lenders that held mortgages on the property.  NAT required a deposit of $1,000 to be

**[*5]** submitted with the application, which was fully refundable if the necessary approvals for the facade easement donation could not be obtained. The application stated that NAT's "operating funds come solely from cash donations made by persons donating an easement. An agreed-upon cash donation of 10% of the easement value is required at the time the easement donation is accepted by * * * [NAT]".

In a letter dated April 2, 2003, the NAT Director of Operations informed petitioner that her application had been accepted and that processing would commence. The letter informed petitioner that NAT:

> will place significant effort to the processing of your application. Processing an application is complex and time consuming. It involves obtaining approvals from the State and Federal Governments, and your lender. * * *
>
> There is nothing required of you until all approvals are received.

NAT sought the approval of petitioner's mortgage holders regarding the placement of a preservation restriction agreement on her Vanderbilt property. The two mortgage holders executed lender agreements that were submitted to NAT during the approval process.

On May 12, 2003, to comply with another component of the approval process, petitioner executed a National Park Service Form 10-168, Historic

[*6] Preservation Certification Application Part 1 – Evaluation of Significance, to request that the NPS certify the historic significance of the Vanderbilt property. The NPS determined that petitioner's Vanderbilt property contributes to the significance of the Fort Greene Historic District and is a "certified historic structure" for a charitable contribution for conservation purposes in accordance with the Tax Treatment Extension Act of 1980.

Later in 2003, petitioner informed NAT that she had decided not to pursue the donation until 2004. Petitioner needed time to save the additional required cash due, as outlined in the application. By letter dated April 22, 2004, NAT informed petitioner that all of the necessary approvals had been received and that she needed to order an appraisal. NAT provided in the letter a list of appraisers "qualified to do easement appraisals". Petitioner hired one of the listed appraisers, Michael Drazner, formerly of Mitchell, Maxwell & Jackson, Inc. (MMJ), to perform an appraisal of the Vanderbilt property.

Drazner and James Kearns, president of NAT, first communicated in December 2001 when Kearns contacted Drazner to inquire whether he would be able to prepare appraisals for homeowners who were interested in donating facade easements to NAT. Kearns sent copies of reports to Drazner that had been prepared by another appraisal firm outside of the New York City area along with

[*7] some information regarding court cases that involved the charitable contribution of facade easements.

Drazner completed an appraisal of the subject property on May 20, 2004. The Drazner report states that the appraisal was completed in accordance with title XI of the Federal Financial Institutions Reform, Recovery, and Enforcement Act of 1989 and the Uniform Standards of Professional Appraisal Practice. Drazner is a qualified expert in the field of real estate appraisal and valuation.

Petitioner's Vanderbilt property was described in the Drazner report as:

an attached four story, three family townhouse located in the Boerum Hill neighborhood of Kings County. The subject is physically and functionally adequate 'as is' * * * [and] features a rear deck, patio, and clean tiled subcellar below the garden level. This home also includes a wealth of turn of the century details that generate strong demand for such homes in the area. These include wood mouldings, paneling and wainscotting, volume ceilings, exposed brick walls, stained glass windows, original wood planking, and fireplaces.

Drazner determined that the estimated market value of the property was $1,015,000 as of the appraisal date. The Drazner report outlined the use of the three classic approaches to value (sales comparison, cost, and income) that were considered to determine the market value of the Vanderbilt property. The report stated that the sales comparison approach is the "most applicable and has been given greatest weight in the determination of the final value * * * [and] the cost

**[*8]** approach was given least weight due to the age of the subject property." The stated purpose of the report was "to estimate 'as is' value of the subject property and to estimate the impact on the subject property if granted an 'architectural facade easement.'" The report explained that

> An easement is a particularly useful historic preservation tool in several respects. First, it allows an individual to retain private ownership of the property and obtain potential financial benefits. Second, an easement binds not only the current owner, but all future owners as well, ensuring that the property will be maintained and observed by future owners. Third, easements are tailored to meet the needs of the property owner, the individual resource, and the mission of the protecting organization. * * *

> If certain criteria are met, the owner also may receive a Federal income tax deduction equivalent to the value of the rights given away to a charitable, or governmental organization. * * * The deduction the taxpayer is entitled to is equal to the fair market value of the easement, which is generally the decrease in fair market value of the property caused by the restrictions placed on the property because of the easement.

The Drazner report briefly discussed two cases involving easement valuation, Hilborn v. Commissioner, 85 T.C. 677 (1985), and Richmond v. United States, 699 F. Supp. 578 (E.D. La. 1988), and stated that

> As these cases depict, it is extremely difficult for appraisers to estimate the probable and possible impact on a property's value by the imposition of a facade conservation easement that is granted in perpetuity. For most attached row properties in New York City, where there are many municipal regulations restricting changes to properties located in historic districts, the facade easement value tends to be

**[*9]** about 11 - 11.5% of the total value of the property.  That figure is based on the appraiser's experience as to what the Internal Revenue Service has found acceptable (on prior appraisals).

The Drazner report further stated that

> This facade easement can, and often does, have an effect on marketability and the market value of a property.  The measurement of this effect or impact is difficult to quantify with any supported precision.  Articles, periodicals, and books have been written on the subject (measurement of the value of the historic easement).  However, in this market area, there is no measure or formula that is applicable for all properties.  The individual properties are so unique that each case must be evaluated on its own.  Additionally, while there are accepted methods for measuring this effect, only the market can provide the true test.  Nonetheless, there are market measures that provide sufficient data with which to bracket and support a reasonable market indicator.

> Estimating the value of a property after the donation of a conservation easement is very much like condemnation appraisal practice where easements or partial fee interests are taken from property owners by a sovereign.  Attempts must be made to define what rights have been lost by the property owners and what elements of damage (or enhancement) are involved in the loss.  Because real estate is not bought and sold in a vacuum, the appraiser has endeavored to place himself in the mindset of competent buyers and sellers and to examine considerations they have actually had, or are likely to have, in the buying or selling of a property encumbered by a facade easement.

> \*     \*     \*     \*     \*     \*     \*

> It is now generally recognized by the Internal Revenue Service that the donation of a facade easement of a property results in a loss of value * * * between 10% and 15%.  The donation of a commercial property

[*10] results in a loss of value of between 10% or 12% or higher if development rights are lost. The inclusive data support at least these ranges, depending on how extensive the facade area is in relation to the land parcel.

It is our opinion that the presence of the facade conservation easement would alter the market value of the subject property. In the subject's market area, the appraiser cannot precisely estimate the extent to which this "loss in value" will result from the facade easement due to the lack of market data. In this situation it is the appraiser's conclusion that the value of the facade conservation easement * * * on the subject property would be estimated at $115,000, which is approximately 11.33% of the fee simple value of $1,015,000. This conclusion is based on consideration of range of value that the I.R.S. has historically found to be acceptable as well as historical precedents. Therefore, the presence of the historic facade easement would decrease the fair market value of the property rights held by the homeowner of the subject property to $900,000.

On June 23, 2004, Kearns signed the conservation deed on behalf of NAT.

On September 21, 2004, the City of New York recorded the conservation deed of easement for the Vanderbilt property. The deed of easement for the subject property is considered to be only an architectural facade conservation easement.

Petitioner attached Form 8283, Noncash Charitable Contributions, to her 2004 Form 1040, U.S. Individual Income Tax Return, and reported a $115,000 gift to charity on line 16 of Schedule A, Itemized Deductions. The Form 8283 filed had two versions of page 2, with one signed by the appraiser and president of NAT and the other lacking these signatures. Both reported essentially the same information:

**[*11]** (1) a description of the donated property as a facade easement with respect to the Vanderbilt property; (2) the overall physical condition being a "Historic Preservation Easement Donation"; and (3) a stated appraised fair market value of $115,000 for the donated property. On the executed page 2, Drazner signed the declaration of appraiser section and identified the appraisal date as May 20, 2004, and Kearns, as president of NAT, signed an acknowledgment of receipt of the contribution by NAT, as donee, on June 23, 2004.

## Discussion

The Court of Appeals stated: "Our conclusion that Drazner's appraisal meets the minimal requirements of a qualified appraisal mandates neither that the Tax Court find it persuasive nor that Scheidelman be entitled to any deduction for the donated easement." Scheidelman v. Commissioner, 682 F.3d at 199. In a case similar to this, the Court noted that "ordinarily any encumbrance on real property, howsoever slight, would tend to have some negative effect on that property's fair market value. Even a nominal encumbrance that is placed by the current owner of the property would, at the very least, deprive a subsequent owner of the opportunity of placing a similar encumbrance on that property." Evans v. Commissioner, T.C. Memo. 2010-207, slip op. at 15. In Evans, the Court found that the appraisal relied on by the taxpayers was qualified but that the taxpayers had not provided sufficient

**[\*12]** credible evidence to shift the burden of proof to the Commissioner under section 7491(a) or to meet their burden of establishing entitlement to their claimed charitable contribution deduction.  Id., slip op. at 7, 15-16; see also Dunlap v. Commissioner, T.C. Memo. 2012-126.  We reach the same conclusions here.

There is no dispute that the "before and after" approach is to be used to determine the fair market value here as it has been in numerous other cases.  See, e.g., Hilborn v. Commissioner, 85 T.C. 677, 688 (1985); Dunlap v. Commissioner, T.C. Memo. 2012-126; Simmons v. Commissioner, T.C. Memo. 2009-208, aff'd, 646 F.3d 6 (D.C. Cir. 2011); Griffin v. Commissioner, T.C. Memo. 1989-130, aff'd, 911 F.2d 1124 (5th Cir. 1990).

As directed by the Court of Appeals, we analyze evidence in this case de novo to determine whether petitioners have satisfied their burden of proving the fair market value of the donated easement.  See Scheidelman v. Commissioner, 682 F.3d at 193, 201.  There is no dispute about the qualifications of the witnesses.  Therefore, we do not include in our discussion the detailed training and background of each.  To assist the Court the testimony should satisfy the standards of rule 702 of the Federal Rules of Evidence, to wit, "(1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to

**[\*13]** the facts of the case." Therefore we focus on the manner in which the value was reached, the reliability of the methodology, and the persuasiveness as applied to the facts in this case.

The Drazner Report

Petitioner did not rely on Drazner at trial. Respondent called Drazner to explain his methodology in anticipation of respondent's position that the appraisal did not satisfy the regulatory requirements for qualification under the statute. (For subsequent years, the statute has been amended. See sec. 170(f) (11) (E) (as amended by the Pension Protection Act of 2006, Pub. L. No. 109-280, sec. 1219(c)(1), 120 Stat. at 1085, effective generally for appraisals prepared with respect to returns filed after August 17, 2006, id., sec. 1219(e)(2), 120 Stat. at 1085-1086)). On brief, however, petitioner argues that the Drazner report is credible evidence of value.

Respondent argues that Drazner's percentage methodology was simply part of a pattern of appraisals NAT provided and that the Drazner report mechanically assigned the percentage and incorporated language of a sample appraisal NAT provided. Respondent also presented evidence that 91 reports MMJ prepared at NAT's request used almost identical language and percentages without regard to

[*14] specific facts and circumstances regarding the property subject to the easement and preexisting restraints on changes to the property.

There is no material dispute between the parties with respect to the value of petitioner's property before the easement. Respondent's criticism of the Drazner report, with which we agree, focuses on Drazner's purported determination of the value of petitioner's property after the easement was granted. Drazner determined the value of the easement by applying an 11.33% discount to the value of the property. His derivation of that percentage was not based on reliable market data or specific attributes of petitioner's property, but rather on his analysis of what the courts and the IRS had allowed in prior cases. As we said in Nicoladis v. Commissioner, T.C. Memo. 1988-163, 1988 Tax Ct. Memo LEXIS 187, at *21, however,

> we do not mean to imply that a general "10-percent rule" has been established with respect to facade donations. There was a fair amount of discussion by the parties at trial about whether the Court had established a "10-percent rule" in Hilborn. We did not there and do not here. Hilborn establishes as acceptable the before and after method of valuation, and while under the circumstances of that case a 10-percent figure was relied upon, valuation itself is still a question of facts and circumstances. * * *

Although the Drazner report set forth boilerplate standards for valuing property, it is apparent that Drazner's bottom line was the equivalent of making a claim for "all

**[*15]** that the traffic would bear." He opined that the value of the easement, the equivalent of loss in market value of the subject property due to grant of the easement, was $115,000. That conclusion was not based on qualitative factors for the Vanderbilt property or the specific attributes of that property but was based on mechanical application of a percentage with no demonstrated support as to its derivation, other than acceptance of similar percentages in prior controversies. Thus the report was not based on sufficient facts or data and was not the product of a reliable methodology, and Drazner's methodology was not reliably applied to the facts of the case. For those reasons, it was not credible.

Petitioners' Expert Evidence

Petitioners' expert at trial was Michael Ehrmann, who also had the necessary qualifications to appraise the easement but made factual and calculation mistakes, some of which he admitted, that undermined the reliability of his report.

Ehrmann had prepared a market study for NAT's counsel that was attached to his report in this case. The information that he relied on came from NAT through its counsel. He incorporated material recommended by NAT's counsel, including earlier appraisals by his employer. Ehrmann admitted that his report did not accurately describe the easement, stating that his description was "a summary of my knowledge about the easement program that I've gotten over the years." He

**[\*16]** relied on outdated information rather than contemporaneous inspection, used alleged comparables from outside the geographical area of petitioner's property, and applied an unsupported and unrealistic adjustment to petitioner's Brooklyn townhouse as compared to a detached house in Evanston, Illinois. His methodology is undermined by these errors. See Evans v. Commissioner, slip op. at 10.

Petitioners argue that Ehrmann's appraisal should be accepted in part because it relied on "the cumulative results of MMJ's ninety-one facade easement valuations", which we reject as unpersuasive for the reasons that we reject the Drazner appraisal. Ehrmann ignored studies suggesting a contrary result and adopted those supporting his client's desired value. Ehrmann's testimony had all of the earmarks of overzealous advocacy in support of NAT's marketing program and, indirectly, petitioner's tax reporting. His conclusion that the easement should be valued at $150,000 is unpersuasive and not credible.

Expert opinions that disregard relevant facts affecting valuation or exaggerate value to incredible levels are rejected. See Boltar, L.L.C. v. Commissioner, 136 T.C. 326, 335 (2011) (and cases there cited); Chiu v. Commissioner, 84 T.C. 722, 734-735 (1985); Garrison v. Commissioner, T.C. Memo. 1986-261 (concluding that the taxpayers were "far too aggressive in their

**[*17]** claimed value of * * * [the donated] property and in seeking to profit from their 'good works' at the expense of Uncle Sam"). An expert loses usefulness to the Court and loses credibility when giving testimony tainted by overzealous advocacy. Boltar, L.L.C. v. Commissioner, 136 T.C. at 335-336. Ehrmann's conclusion does not help the Court because it does not satisfy the standards of rule 702 of the Federal Rules of Evidence. Because we cannot accept petitioners' expert's testimony as credible, the burden of proof did not shift under section 7491(a).

Respondent's Expert Evidence

Respondent's first valuation expert was Timothy Barnes. Barnes analyzed the terms of the easement, zoning laws, and regulations of the LPC and concluded: "in highly desirable, sophisticated home markets like historic brownstone Brooklyn, the imposition of an easement, such as the one granted on June 23, 2004, is not a deterrent to the free trade of such properties at fully competitive prices and does not materially affect the value of the subject property." Barnes researched the geographic area of petitioner's property, contacting real estate brokers and valuation professionals in the Brooklyn market to determine whether the imposition of a facade easement affected the marketability of or ability to finance a townhouse within the Fort Greene Historic District. The "uniform response" was

[*18] that such easements did not negatively affect buyer interest, marketing time, or financing. He explained during his testimony that the pool of prospective buyers within the five boroughs of New York City was a more reliable measure of market effect than analysis comparing communities outside of New York City, which is one of the reasons that Ehrmann's report was not reliable. Barnes also opined that a difference between the controls available to LPC, which exercises a police power of the city, and NAT are the placement of the burden on the homeowner to go to court and seek an exception, in the first instance, and on the private party seeking to enforce the restriction to go to court, in the second.

Barnes also criticized Ehrmann's calculations, his selection of comparables, and particularly his failure to account for differences in overall lot sizes and floor space of the allegedly comparable properties. Although petitioners claim that the errors should be disregarded as immaterial and that we should accept Ehrmann's subjective judgments, we believe that Barnes' reasoned judgments are more reliable.

Respondent also presented expert testimony by Stephen D. Dinklage, an engineer employed by the IRS, who used an alternative approach based on condemnation techniques and determined that the grant of the easement did not have a material effect on fair market value. Dinklage used market data to divide

**[\*19]** the value of the land from that of the building and then used a modified cost approach to isolate that portion of petitioner's townhouse affected by the facade easement. He concluded that because only the facade was affected by the easement and the loss of utility was only to the facade, the restrictions would not have a material effect on the market value of the whole property. Dinklage reasoned that a hypothetical buyer would not pay less for the Vanderbilt property because it was already restricted by the LPC regulations and the easement did not make a difference. This conclusion is consistent with other evidence.

Other Evidence

Respondent argues that the LPC created restraints on properties such as petitioner's so that the NAT easement had no material effect. Petitioners contend that the LPC does not enforce the restrictions as effectively as NAT. That speculation is based on testimony of a representative of NAT, is not supported by anything but anecdotes, and is contrary to evidence specifically related to the Vanderbilt property.

The chairman of the Fort Greene Association, which has as its mission preservation within the Fort Greene boundaries, testified specifically with respect to the area in which the Vanderbilt property is located. In his experience, the LPC provides guidelines to maintain the historic integrity of facades in historic districts

[*20] in New York City.  The LPC enforces guidelines and issues violation notices, but "the violation only takes effect and adds any value when the title changes hands."

Although he was called as a witness by petitioners, on cross-examination he testified:

> Q:      You like being in the preservation district?
>
> A:      I like being in the preservation district.  The preservation district actually has created Fort Greene to what it is today.  It's created -- it's an economic engine for Fort Greene.
>
> Q:      So you would consider the preservation district an effective agency for the city of New York?
>
> A:      The Landmark Preservation agency [is] an effective agency of the city of New York, it does what it can do in its scope.

A logical inference from this testimony is that preservation of historic facades is a benefit, not a detriment, to the value of Fort Greene property.

The conclusion that the easement did not materially diminish the value of petitioner's property is also supported by petitioner's own testimony.  Petitioner testified:

> Well, I was primarily interested in preserving my house itself in light of the dramatic development that was occurring in and around Fort Greene during those years and still is.  I was also intrigued by the tax benefit of preserving the facade which I had intended to do anyway.

**[*21]** I thought it would be the right thing to do for the house. I wanted to preserve the historic facade of the house. I believe in that, I believe in doing that in communities like Fort Greene. I also wanted to benefit tax wise. I didn't know how much I would benefit, but I wanted to benefit from what I was already intended to be committed to doing.

We do not believe that petitioner would have granted the easement if she had anticipated a substantial drop in the market value of her property as a result. It is even less likely that she would have agreed to a restriction that reduced the value of her property by the relatively large amount claimed, $115,000, or the even larger amount proposed by Ehrmann, $150,000.

On review of all of the evidence, we conclude that the preponderance supports respondent's position that the easement had no value for charitable contribution purposes. Respondent's position is the more persuasive, regardless of the burden of proof.

We have considered the other arguments of the parties. They do not alter our conclusions.

To reflect the deductibility of petitioner's cash payment,

Decision will be entered

under Rule 155.
